RECORD NO. 21-4109

*In The*

# United States Court of Appeals

### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## LUIS ANALBERTO PINEDA ANCHECTA,
## a/k/a Luis Peneda, a/k/a Luis Analberto,

*Defendant – Appellant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## AT CHARLOTTE

———————

### BRIEF OF APPELLANT

———————

**Anthony Martinez**
**FEDERAL PUBLIC DEFENDER FOR THE**
  **WESTERN DISTRICT OF NORTH CAROLINA**

**Ann L. Hester**
**Assistant Federal Public Defender**
**129 West Trade Street, Suite 300**
**Charlotte, North Carolina 28202**
**(704) 374-0720**

*Counsel for Appellant*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................iii

INTRODUCTION............................................................................................... 1

JURISDICTIONAL STATEMENT ..................................................................... 2

STATEMENT OF THE ISSUES ......................................................................... 2

STATEMENT OF THE CASE ............................................................................ 2

    I.    The government charges Pineda with violating the federal
        kidnapping statute ................................................................................ 2

    II.   Flor Mejia's story doesn't add up ................................................... 3

    III.  The court overrules Pineda's objection to the government's
         closing argument based on evidence that was never admitted at
         trial, and the prosecutor vouches for Mejia's truthfulness ...................... 15

    IV.  The jury asks two questions demonstrating that it doubts Mejia's
         story, but it finds Pineda guilty, and the district court denies
         Pineda's motion for a new trial.................................................................. 18

    V.   The court sentences Pineda to 20 years in prison .................................... 19

SUMMARY OF ARGUMENT ....................................................................... 20

STANDARD OF REVIEW............................................................................. 21

ARGUMENT .................................................................................................. 22

    I.    The district court reversibly erred, in violation of due process,
        when it allowed the prosecutor to make closing arguments that
        repeatedly relied on facts not in evidence ................................................. 22

         A.    The prosecutor's remarks were improper....................................... 23

        B.     The prosecutor's improper remarks prejudiced Pineda and thus denied him a fair trial ............................................................... 29

II.    The district court plainly erred when it allowed the prosecutor to vouch for Mejia's credibility in closing argument..................................... 32

        A.     The prosecution improperly vouched for its own witness........... 33

        B.     The error is plain.................................................................. 36

        C.     The error denied Pineda a fair trial................................................ 36

        D.     The Court must notice the error.................................................... 39

CONCLUSION ........................................................................................... 40

REQUEST FOR ORAL ARGUMENT ........................................................ 40

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>CASES</u>

*Berger v. United States,*
     295 U.S. 78 (1935) .................................................................................... 23

*Estelle v. Williams,*
     425 U.S. 501 (1976) .................................................................................. 22

*In re Wray,*
     433 F.3d 376 (4th Cir. 2005) ................................................................... 21

*Puckett v. United States,*
     556 U.S. 129 (2009) .................................................................................. 36

*Taylor v. Kentucky,*
     436 U.S. 478 (1978) .................................................................................. 22

*United States ex rel. Shaw v. De Robertis,*
     755 F.2d 1279 (7th Cir. 1985) ................................................................. 22

*United States v. Brown,*
     765 F.3d 278 (3d Cir. 2014) .................................................................... 28

*United States v. Caro,*
     597 F.3d 608 (4th Cir. 2010) ................................................................... 23

*United States v. Chong Lam,*
     677 F.3d 190 (4th Cir. 2012) .............................................................. 29, 37

*United States v. Collins,*
     415 F.3d 304 (4th Cir. 2005) .......................................................... 21, 32, 33

*United States v. Gonzalez-Flores,*
     701 F.3d 112 (4th Cir. 2012) ................................................................... 21

*United States v. Green,*
     599 F.3d 360 (4th Cir. 2010) ................................................................... 21

*United States v. Hamm,*
    952 F.3d 728 (6th Cir.), *cert. denied,*
    140 S. Ct. 2695, 206 L. Ed. 2d 837 (2020), *cert. denied sub nom.*
    *Shields v. United States*, 141 S. Ct. 312, 208 L. Ed. 2d 60 (2020) ..............26, 27, 28

*United States v. Harrison,*
    716 F.2d 1050 (4th Cir. 1983) .................................................................. 39

*United States v. Johnson,*
    587 F.3d 625 (4th Cir. 2009) .................................................................... 36

*United States v. Johnson,*
    945 F.3d 174 (4th Cir. 2019), *cert. denied,*
    141 S. Ct. 255 (2020) ............................................................................... 36

*United States v. Kerr,*
    981 F.2d 1050 (9th Cir. 1992) ............................................................ 35, 36

*United States v. Kuljko,*
    ___ F.4th ___, 2021 WL 2431827 (1st Cir. June 15, 2021) ...........................28-29

*United States v. Lewis,*
    10 F.3d 1086 (4th Cir. 1993) .................................................................... 34

*United States v. Lighty,*
    616 F.3d 321 (4th Cir. 2010) ...........................................................*passim*

*United States v. Loayza,*
    107 F.3d 257 (4th Cir. 1997) .................................................................... 39

*United States v. Mitchell,*
    1 F.3d 235 (4th Cir. 1993) ....................................................................... 22

*United States v. Moore,*
    710 F.2d 157 (4th Cir. 1983) .................................................................... 34

*United States v. Ollivierre,*
    378 F.3d 412 (4th Cir. 2004),
    *cert. granted, judgment vacated on other grounds,*
    543 U.S. 1112 (2005) ............................................................................... 22

*United States v. Rodriguez-Adorno*,
    695 F.3d 32 (1st Cir. 2012) ............................................................ 35, 36

*United States v. Saint Louis*,
    889 F.3d 145 (4th Cir. 2018) .......................................................... 21, 37

*United States v. Samad*,
    754 F.2d 1091 (4th Cir. 1984) .............................................................. 34

*United States v. Scheetz*,
    293 F.3d 175 (4th Cir. 2002) ................................................................ 33

*United States v. Smith*,
    441 F.3d 254 (4th Cir. 2006) ................................................................ 33

*United States v. Sullivan*,
    455 F.3d 248 (4th Cir. 2006) ................................................................ 36

*United States v. Velazquez*,
    ___ F.4th ___, 2021 WL 2559474 (9th Cir. June 23, 2021) ......................... 31-32

*United States v. Wihbey*,
    75 F.3d 761 (1st Cir. 1996) ............................................................ 35, 36

*United States v. Williams*,
    112 F. App'x 581 (9th Cir. 2004) ......................................................... 34

*United States v. Wilson*,
    135 F.3d 291 (4th Cir. 1998) ............................................... 25, 26, 27, 28

*United States v. Woods*,
    710 F.3d 195 (4th Cir. 2013) ........................................................ *passim*

*United States v. Young*,
    470 U.S. 1 (1985) ................................................................ 33, 36, 37

## **STATUTES**

18 U.S.C. § 1201(a)(1) .................................................................... 2, 3

18 U.S.C. § 3231 ................................................................................................ 2

18 U.S.C. § 3742 ................................................................................................ 2

28 U.S.C. § 1291 ................................................................................................ 2

## **RULE**

Fed. R. Crim. P. 29 ........................................................................................... 15

## **GUIDELINES**

U.S.S.G. § 2A2.1 .............................................................................................. 19

U.S.S.G. § 2A2.1(b)(7)(B) ............................................................................... 19

## **OTHER AUTHORITY**

*The Free Dictionary by Farlex*, available online at
https://idioms.thefreedictionary.com/I%27m+going+to+kill
(last accessed June 30, 2021) ........................................................................... 31

## **INTRODUCTION**

To establish that Luis Pineda Anchecta ("Pineda") kidnapped his former live-in girlfriend, Flor Mejia, and that he used a car and an interstate highway to do it, the government relied almost entirely on Mejia's testimony as the only witness to the events. Mejia's story was riddled with inconsistencies, and a real question existed about whether the jurors would believe her testimony. In fact, the jury's two questions to the court minutes before it returned a guilty verdict suggested that it had doubts about Mejia's version of the events.

To shore up Mejia's questionable testimony, the government repeatedly ran afoul of well-established limitations on closing arguments.

First, the prosecution argued facts that were not in evidence when it argued that photos admitted into evidence came from Pineda's phone and depicted Pineda's arm, that the tattoos shown in the photos represented Pineda's and Mejia's initials, and that the tattoos were freshly made two days before the alleged kidnapping. Relying on these factual assertions, the government told the jury that these photos showed Pineda was "obsessed" with Mejia and that they backed up her version of events.

Second, in rebuttal, the prosecution improperly vouched for the truth of Mejia's testimony, arguing that "[s]he sat on this witness stand. She put her hand on this Bible, and she told you the truth," JA 408, and that Mejia's stories were

inconsistent "[b]ecause when you're telling the truth about something that happened a year ago you should have faded memory." *Id.*

Because Pineda's guilt or innocence largely hung on Mejia's testimony, the improper arguments were pervasive and were designed to reinforce Mejia's story, and the jury indicated that it questioned her credibility, these errors deprived Pineda of a fair trial and undermined the proceeding's integrity. Consequently, this Court should vacate Pineda's conviction and remand this case for a new trial.

## JURISDICTIONAL STATEMENT

Pineda appeals from a judgment entered March 4, 2021, in the United States District Court for the Western District of North Carolina. JA 553. He timely filed a notice of appeal on March 5, 2021. JA 560. This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291. The district court had jurisdiction under 18 U.S.C. § 3231.

## STATEMENT OF THE ISSUES

I.    Did the district court reversibly err, in violation of due process, when it allowed the prosecutor to make closing arguments that repeatedly relied on facts not in evidence?

II.   Did the district court plainly err when it allowed the prosecutor to improperly vouch for the truth of Flor Mejia's testimony?

## STATEMENT OF THE CASE

### I.    The government charges Pineda with violating the federal kidnapping statute.

On January 22, 2020, the Grand Jury charged Pineda with kidnapping Flor Mejia on May 21, 2019, in violation of 18 U.S.C. § 1201(a)(1). JA 9. To establish that a

defendant violated subsection (a)(1) of the federal kidnapping statute, the government

is required to prove that he:

> (1)  unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away and held for ransom or reward or otherwise;
>
> (2)  any person; and
>
> (3)(a)  the person was willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary; or
>
> (3)(b)  the offender traveled in interstate or foreign commerce or used the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense.

18 U.S.C. § 1201(a)(1). The indictment charged that Pineda

> unlawfully and willfully did and attempted to seize, confine, kidnap, abduct, carry away and hold F.M. for ransom, reward or otherwise for his own benefit and use, and he used and caused to be used a means, facility and instrumentality of interstate commerce, namely, an automobile and an interstate highway, in committing and in furtherance of the commission of this offense.

JA 9.

## II.    Flor Mejia's story doesn't add up.

Flor Mejia testified that she was in a relationship with Pineda for two years and

first met him when she was in her country, Honduras. JA 150. She doesn't speak

English. JA 172. When she came to the United States in 2017, she and Pineda lived in

Louisiana and eventually came to Charlotte. JA 151. She has a 14-year-old son. JA

151.

After first denying that she had used an assumed name, when confronted with the document, Mejia admitted that she used a fake North Carolina ID under the name Estrella Murcia. JA 174-75. She got it "when [she] didn't have [a] passport here." JA 175.

Mejia testified that on the night of May 21, 2019, she got off work as a painter at 5 p.m., took a shower, and then fell asleep on the sofa in the living room of her apartment, waking up around 9 p.m. JA 152. She was using her phone that night to send messages on Whats App. JA 187. She said that her son was in an upstairs bedroom. *Id.* According to Mejia, when she woke up, she realized she had left her purse in her car, so she got her car keys and went outside. *Id.* She testified that her phone was in her shorts pocket. JA 153.

Mejia told the jury, "When I went outside, I opened the door and then there was somebody behind me, and he grabbed me by my hands and I screamed." JA 153. She said the person who grabbed her had his face covered with something black. JA 156. She said that when the man grabbed her, Pineda was sitting in a car blocking hers in, "and then when he heard me yelling, he ran, and then he stuff a piece of clothing in my mouth" while the other man held her hands behind her back. JA 157-59. Next, she said, the men "threw me in the car, and then Luis got a piece of rope, I don't know how—what you call it. And Luis said, 'Bitch, you're going to be kidnapped.'" JA 158. In Mejia's version of events, the men "threw" her into the passenger side of the

4

car using nothing other than the cloth in her mouth. JA 159. Mejia admitted she didn't

fight against the men. JA 164. She wasn't blindfolded. JA 185.

Mejia's son testified that he heard someone yelling, but he didn't pay attention

because he was talking to his grandma on the phone. JA 196. When he got off the

phone, he looked for his mom and didn't find her. JA 196. He testified that he tried to

call her, but she didn't answer, and that she was gone only an hour or two. JA 196-97.

He didn't tell the police officers that he heard any yelling. JA 203. He lives with his

mom, and they have talked about this case and talked about him testifying. JA 203.

Mejia testified that Pineda went to the driver's side of the car, and she didn't

know where the masked man went. JA 159. She testified that she thought that he got

into the car, but he didn't. *Id.* She never offered any description of the masked man to

police officers. JA 185.

Mejia claimed that Pineda had her hands tied up in the car around the seat and

had a rope tied around her neck. JA 160-61. She testified that "he tied me up with the

same rope because it was long." JA 161. The rope, according to Mejia, was a kind of

rope that she had seen in Pineda's car before, because he uses that material in his

work. JA 160. But when Mejia spoke to a Spanish-speaking officer at the scene, she

did not mention anything about her hands. JA 177. She also testified that when she

left her house, she called her son, but he was talking to her mom on the phone and

didn't know she was leaving. JA 172-73. She didn't explain how she could have called

her son if her hands were tied. Mejia also testified that Pineda was holding the rope while he was driving. JA 161.

According to Mejia, while Pineda was driving, he told her "[t]hat he was going to kill me and that he was not going to allow that if I wasn't for him than nobody else was going to have me." JA 162. She testified that he told her he had made a pact with the devil. JA 163. And she told the jury that "[h]e would kiss me whenever the traffic lights would turn on so that nobody could see that he had me tied up." JA 163. She said that by then, she did not have the cloth in her mouth any more, but he had tied the rope around her neck and her mouth. JA 164.

Mejia testified that Pineda took her "to some wooded area," that he turned the car off, and that rather than getting out of the driver's side door, he climbed over her and went out of the passenger side of the car to get out. JA 165. She said that he then "let me go from the seat and then he grabbed – well, he didn't grab me. He dragged me through the woods" while she was still tied up with the rope. JA 165. As seen in Officer Crespi's body camera video, though, Mejia isn't dirty and doesn't show any signs of having been dragged through a wooded area. *See* Govt. Ex. 9A. According to Mejia, Pineda was squeezing her hands, "[a]nd then he kept saying that he had made a pact with the Saint of Death and that he was going to kill me that day." JA 165.

Mejia said that he tried to kill her, and that "[h]e also tried to do my – under my shorts, the button on my shorts, but he could not." JA 166. She went on to say, "He threw me to the ground because he's a man, and I'm a woman, and I'm not that

6

strong." JA 166. Mejia first testified that she was on her back, he was on top of her, and "[h]e had me by my hands and with the other hand he was trying to undo my shorts." JA 166. Then she said that he was trying to undo her shorts with one hand while he was squeezing her neck with the other hand and she was struggling to leave. JA 166. Mejia told the jury that she was able to escape because Pineda tripped and fell next to her, and then she "undid the rope that I had around my neck, and I left running. . . . Towards the street." JA 167. She did not explain how Pineda could have tripped if he was sitting on top of her on the ground.

According to Mejia, she ran to the street, yelling. JA 168. She said that Pineda was running after her but that he left "[w]hen two Americans were in the car, and they helped me." JA 168. She said that she "saw that he went towards his car, but the car was locked," and that she knew the car was locked "[b]ecause we saw that he tried to open the door, but he could not." JA 169.

Brittany Gambrell was one of the two women who encountered Mejia on Lancaster Highway that night. She was driving home from her job as a chef at about 11:30 p.m. when she noticed that there was someone standing in the middle of the road, which is two lanes, waving and "trying to get somebody to stop." JA 111-12. When she stopped, the woman came up to her window and "kind of knocked" on it "a little bit." JA 112. Gambrell observed a woman who was "kind of hyperventilating," looked like she had been crying, didn't speak English, and was saying "policia policia." JA 111-12. The woman was "reaching for her throat." JA 112.

Gambrell called 911 on the speaker phone in her car. JA 111, 115; Govt. Ex. 1A
(recording of 911 call). The woman asked if she could use Gambrell's phone, and
Gambrell watched her "trying to look someone up on Facebook and try to get their
information off Facebook." JA 114.

Taylor Larsen, Gambrell's friend who worked with her, was in the car behind
Gambrell. JA 111. Gambrell and Larsen moved the woman to the side of the road
until the police arrived and got out of the car. JA 113. They waited 10 to 15 minutes
before 911 showed up. JA 113. While they were waiting, the woman tried to get them
to go over to a car parked beside the road. JA 113. Gambrell "wasn't comfortable
with that so I just told her to stay over here" and they were able to get her "to stay in
one place, at least until the police showed up." JA 113. Gambrell testified that "before
I had stopped my car, I thought I saw somebody run off. Because where it's at is, like,
there's woods kind of next to where the road is." JA 114. Gambrell admitted, though,
that she didn't mention in the 911 call that she saw any movement along the edge of
the woods. JA 116. She also didn't mention seeing movement near the woods when
she typed up a statement for a detective a week or two after the incident. JA 117.

Nicholas Larsen, a paramedic, testified that he was reporting to a different call
when they stopped by "this car that was pulled over with some folks." JA 205-06.
And they "noticed that there was a woman there that was a little bit distraught,
seemed very anxious, very nervous." JA 206. The woman "was just saying that her
phone was left in her – or locked in the car and she wanted to get it out." JA 206.

Since "[w]e don't have that kind of authority, not to mention we were on our way to what we presumed would be an emergency," the paramedics "called the police department to notify them that this is a lady that's stranded out here and just needs a hand." JA 206. Mejia didn't say she needed medical assistance; she was just interested in her phone. JA 211. They left to report to the location of their original call. JA 208.

Officer Kevin Crespi reported to the scene, which he said was located at 13227 Lancaster Highway, in response to the original call for service, which came in as an assist medic call. JA 121. He was wearing a body-worn camera. JA 129; Ex. 9A. He had a hard time understanding Mejia because of the language barrier and said, "I just know she was heavily breathing." JA 121. When he arrived, he "assumed it was just an assist medic call, that it wasn't domestic related or anything like that." JA 121. The woman "was just talking in Spanish trying to explain what was going on," and they "ended up walking to the car that was located down there because she kept pointing in that direction." JA 122. There was a silver Ford Fusion parked on the side of the road. JA 123.

As they walked to the car, "[s]he kept pointing towards the wooded area," and the officers "were just trying to figure out what was going on." JA 123. They went to the car because the woman was trying to get her cell phone, but the car was locked. JA 133. When he looked in the car, Crespi saw a big bundle of white cord "on the back seat on the floor" of the car. JA 138. The car was parked across the street from a street light. JA 148; Def. Ex. 1.

Mejia pointed toward the wooded area, and "there was a white plastic cord that was there," and she "[k]ept pointing to her neck." JA 123. Crespi testified that he "could see that there was visible redness, some scratches on her neck, and her lower legs." JA 123. And she was motioning "showing signs of, like, that she was strangled in the process." JA 123. She was "also showing her mouth." JA 124. She said, "ex-novio," and from that he "determined it was domestic violence related that just happened, an assault that happened." JA 124. No one told him that anything happened behind the point where that rope was located. JA 142.

After reporting to the address of their original call, the paramedics returned to the scene where Larsen said, "we found the police officers were waving us down to pull over and help assist them." JA 206. The woman "was still very anxious, seemed like something was up." JA 207. They encouraged her to slow down her breathing and placed a cervical collar on her neck as part of their protocol because she "did have some tenderness to the back of her neck." JA 207. She had some redness on one side of her face and her neck. JA 208. They used a language line to translate "that she reported to have been strangled." JA 208. Then, when a Spanish-speaking officer arrived, "it was translated to us more that she was maybe had something stuffed in her mouth and then that was around the back of her head like a gag to prevent her from maybe talking or yelling." JA 209. So they "had those two conflicting ideas" and "didn't get a perfect view" of what she was saying. JA 209. Mejia mentioned that her

left hand was slapped, but that was the only mention of hands or wrists. JA 211. They transported her to Atrium Health Pineville. JA 209.

Officer Crespi told the jury that he's familiar with the area where the car was stopped on Lancaster Highway, and if you go through the wooded area, it leads to open land; on the left-hand side it goes down to a creek. JA 134. He said it's "very difficult" to get through that area "due to all the brush that's there." JA 137. Mejia's son testified that he went to that area a year and a half or two years ago with Pineda, to go fishing. JA 201.

Using a map of the area, Govt. Ex. 2, Crespi testified that Mejia's residence was located at 1411 Sharon Road West, and that he responded to that area. JA 128. And he identified Lancaster Highway as U.S. 521, which he described as "a main highway." JA 129. He testified that Mejia's residence and the scene of the offense are about 4 miles apart. JA 129.

Nicole Cierpial, a crime scene technician with the Charlotte-Mecklenburg Police Department, took photographs of Mejia at Atrium Health Pineville. JA 225; Govt. Ex. 6A, 6B, 6C, 6D, 6E. She documented a red mark on Mejia's forehead in Exhibit 6A, JA 227; scratch marks on the side of her neck in Exhibit 6B and 6E, JA 227-28; Scratches on her shoulder in Exhibit 6C, JA 228; and a scratch on her ankle in Exhibit 6D, JA 228. She didn't document any injuries on Mejia's hands, wrists or forearms, and she did ask Mejia if she had any other injuries. JA 232. She also took a buccal swab from Mejia to collect DNA. JA 233. She took pictures at the scene of the

parked car, but she didn't find any cloth anywhere. JA 230. She didn't swab the rope

for DNA. JA 234.

Nora Beamon, another crime scene investigator, searched the car after it was

towed from the crime scene. JA 238. She found two cell phones in the driver's seat

area of the car. JA 240, Govt. Ex. 8A. There was a third phone in the vehicle, located

on the passenger seat, which she also collected. JA 250, Def. Ex. 4. She also found a

passport and vehicle registration, which were not in Pineda's name. JA 240-41; Govt.

Exs. 8B & 8C. She did not find any cloth in the car. JA 252.

Roy Patterson, a digital forensic analyst, JA 347, was asked to process two of

the three phones related to this case. JA 349. They were both touchscreen phones

with cameras. JA 350. He testified that he pulled ten images from one of the phones,

a Samsung phone; the government offered these images into evidence as Exhibits

17A through 17J.[1] JA 351, 354-55. Patterson testified that the date of the first eight

images, corresponding to Exhibits 17A through 17H, was May 19th. JA 357-60. But

he acknowledged that the report he relied on, Exhibit 17, had no date for the creation

of the images or the dates when they were accessed, even though a Cellebrite report

would have that information for some of the files. JA 363.

Patterson merely identified the images as having come from the phone; he did

not testify about what was depicted in the images or who was shown in the images. JA

---

[1] The district court overruled Pineda's objections to the admission of Exhibits 17 and
17A through 17J on relevance grounds. JA 353, 356.

352-62. He didn't know who took the images or their context; his job is just to see what's on the phone and provide that information. JA 364. In fact, no one testified about who or what the images depicted. Relevant to this appeal, Exhibit 17E shows what appears to be an upper arm tattoo with a cross and the letters L, F, R, and O. Govt. Ex. 17E. Exhibit 17H appears to be the same tattoo shown in Exhibit 17E. Govt. Ex. 17H. No one's face is shown in either photo. Exhibit 17J is a photo of a bearded man in an orange shirt. Govt. Ex. 17J. The remaining photos in the Exhibit 17 series show tattooed body parts (not showing anyone's face) and of a case of Modelo beer.

Patterson testified that he did not know who owned the Samsung cell phone from which he extracted the images. JA 365. The extracted images also had multiple selfie images of a woman, but he did not attempt to discover that person's identity. JA 364. And the phone contained a lot of images of other people besides the man pictured in Exhibit 17J.  JA 365.

The government's final witness was Rudy Aguilar, who had pleaded guilty to illegal reentry and unlawful possession of ammunition in June 2019. JA 369. He met Pineda through work; they worked for the same contractor installing fiber optic cable for AT&T. JA 370-71. They sometimes socialized, but "not much." JA 370. He testified that the spool of cord shown in Govt. Ex. 8E "is something that we used to carry out the work"; it is "[s]omething that you put inside the fiber optic to pull." JA 372.

Aguilar testified that he and Pineda had "some quick conversations" about Flor Mejia. JA 373. Pineda asked "have you seen her. Have you, like, by chance gone by there, have you seen her." JA 373. Aguilar said that Pineda "told me that [she] had accused him of domestic violence and that [she] had sent the police after him." JA 374. And he said that "he just told me that sometimes they would fight and get into arguments, but he would never tell me why or anything else." JA 374. Aguilar also testified that "[o]n one occasion he showed me a tattoo or tattoos that he has" and that the tattoo was of "[t]he Santa Muerte" and was "[o]n the leg." JA 375. Aguilar did not testify about what "Santa Muerte" looks like. JA 375. Nor did he identify any of the photographs in Exhibit 17 or 17A through 17J as depicting Pineda or Pineda's tattoos. JA 375.

Aguilar agreed that Pineda had said to him, "It was a miracle from God that he did not kill her." JA 376. Aguilar explained, "I don't know if he was joking or if he was saying the truth." JA 376. Aguilar didn't remember reporting to police that Pineda said "Thank God he did not kill her because he would also have to kill the child too." JA 376. Aguilar did tell police that Pineda told him that Flor Mejia "had gotten in a car with him." JA 377. Aguilar didn't remember saying that Pineda told him it was a borrowed car or that he had used a rope from the job or that he had tried to kill her. JA 377.

After the government rested, the district court denied Pineda's motion for an acquittal under Rule 29 of the Federal Rules of Criminal Procedure. JA 380-81. The defense did not put on any evidence. JA 381.

### III. The court overrules Pineda's objection to the government's closing argument based on evidence that was never admitted at trial, and the prosecutor vouches for Mejia's truthfulness.

Despite the fact that it never presented any testimony identifying Pineda as the owner of the Samsung phone or as the person shown in Exhibit 17 and Exhibits 17A through 17J, the government argued to the jury that the phone was Pineda's, that the photos depicted Pineda's tattoos and, even beyond that, that the tattoos were fresh and demonstrated that Pineda was obsessed with Flor Mejia and kidnapped her for that reason.

The government began by saying "As we go through the elements, the case is clear that the testimony trail, the physical evidence trail, and, lastly, the digital footprint trail, all point to the same man, Luis Pineda." JA 392. Then, it went on to argue that "the government's evidence has shown" that "the defendant, even after they broke up, was obsessed with Flor Mejia." JA 393. And it went even further, arguing, "[y]ou may recall the photos from the defendant's phone. There's a tattoo on or about May 19, which is two days before this kidnapping occurred, a fresh tattoo on the defendant's arm. You see the two initials. You see an F--." JA 393.

At this point, defense counsel objected that the government was arguing information that was not in evidence. JA 393. The court overruled Pineda's objection,

and the prosecutor went on to argue, "You see the photograph, there is an F and there's an L. It is the government's contention that the F is for Flor, the L is for Luis, the defendant. That is two days before he committed this kidnapping." JA 394. The prosecutor then relied on his assertion that the tattoo was on Pineda's arm and was fresh to bolster Mejia's credibility, arguing: "You were able to judge her credibility. She told you that her and the defendant had dated, but he was very jealous, he was very possessive as shown by the tattoos, and that if he couldn't have her, she testified, no one else could." JA 395. The prosecutor relied on other information not in evidence when he argued, "Also mentioned from the defendant's own mouth that he had her in the car, and also mentioned that he used a rope from their work," even though Aguilar testified that he didn't remember telling officers that Pineda said those things. JA 396. Then, the prosecutor returned to his argument regarding the Exhibit 17 photos at the end of his closing, saying, "He left a digital calling card of his kidnapping which are photos on the phone." JA 397.

Defense counsel argued that Flor Mejia's story was not believable and that she was a proven liar, as demonstrated by her use of a fake ID, which she denied having until she was confronted with it. JA 398. The defense also pointed to the lack of any injuries to Mejia's wrists, even though she testified that Pineda tied her by the hands. JA 401. And Pineda's counsel pointed out that although the crime-scene investigator took a buccal swab from Mejia, no one tested the rope for Mejia's DNA, even though she claimed to have been tied up with it. JA 401. She further argued that Mejia's

phone was also in the car and that Mejia "did provide her information to the officers
to be able to see in the phone. You have none of that information. Why?" JA 402.
And she asked the jury why—if Pineda really did climb over Mejia and drag her out of
the car—the phones are neatly placed in the seat of the car, Mejia had no dirt on her,
and the car was locked. JA 402.

Defense counsel then attacked Mejia's story that a masked man jumped from
behind a bush and grabbed Mejia, asking why police did not take photos of the
apartment that evening or knock on doors "to see if anyone heard the supposed
scream that she now says she made that she never told any officers." JA 403-04. Nor
did police look for masks or "go and see if there was a surveillance camera [that]
would have clearly showed everybody what happened, if anything." JA 404. In sum,
Pineda's counsel argued: "we admit something happened that night. I don't think
anyone can deny something happened, just wasn't a kidnapping." JA 405.

In rebuttal, the government argued that Pineda went to Mejia's apartment
"along with his unknown friend, to go inside that apartment do whatever he wanted
to do" but that "[h]e didn't expect Flor Mejia to walk outside before they could break
in so he had to adjust." JA 406. Then, according the government, "[h]is friend
grabbed Flor and threw her in the car. And we don't know where that person went."
JA 406. The government then asserted, "She put her hand on this Bible, and she told
you the truth." JA 408. The government acknowledged, "Did she forget to mention a
bush? Probably. Did she forget to tell all of those people on the side of the road about

17

the masked man? Probably." JA 408. It explained those inconsistencies by again

vouching for Mejia's truthfulness, saying: "when you're telling the truth about

something that happened a year ago you should have faded memory." *Id.* When she

summed up, the prosecutor reminded the jury of her previous comments about

Mejia's truthfulness, telling the jury: "The word 'verdict' means to speak the truth.

And when you go and you deliberate you are going to be asked to render a verdict in

this case, and your verdict must be based on the truth. And the truth is that Luis

Pineda kidnapped Flor Mejia on May 21, 2019." JA 410.

**IV.    The jury asks two questions demonstrating that it doubts Mejia's story, but it finds Pineda guilty, and the district court denies Pineda's motion for a new trial.**

After receiving instructions from the district court, the jury was escorted from

the courtroom at 12:08 p.m. JA 420. At 1:53 p.m., the jury knocked with two

questions:

> 'Number 1: Could the kidnapping have occurred at any time during the night? In other words, even if the victim initially went with the defendant but later was prevented from leaving, is that still kidnapping?'

> And then '2. Is there a length of time that a person needs to be held against their will to qualify as kidnapping?'"

JA 421. The court proposed to answer these two questions by instructing the jury, "If

you find beyond a reasonable doubt that at some point in the encounter the alleged

victim was held against her will for an appreciable time, and you find beyond a

reasonable doubt that the other elements of kidnapping have been met you may find the defendant guilty of the crime charged." JA 421.

Neither party objected, and after the jury entered the courtroom at 2:15, the court read that instruction to the jury, twice. JA 423-24. The jury was escorted from the courtroom at 2:19. JA 424. At 2:33, less than 15 minutes later, it indicated that it had reached a verdict. JA 424. It convicted Pineda under the federal kidnapping statute. JA 425, 430. Pineda moved for a new trial arguing, among other things, that the prosecutor made closing arguments without a basis in the evidence, depriving Pineda of a fair trial. JA 435-36. The district court denied Pineda's motion for a new trial. JA 481.

## V. The court sentences Pineda to 20 years in prison.

Over Pineda's objection, the district court applied a cross-reference to assault with intent to commit murder under U.S.S.G. § 2A2.1, which led it to apply a base offense level of 33. JA 531. The court then added four levels under U.S.S.G. § 2A4.1(b)(7)(B), resulting in a total offense level of 37. JA 531-32. The court found Pineda's criminal history category was II, leading to a Guidelines sentencing range of 235 to 293 months. JA 532. After denying Pineda's request for a downward variance, the court sentenced Pineda to 240 months' imprisonment and 5 years' supervised release. JA 546-47.

The court entered judgment on March 4, 2021, and Pineda appealed to this Court on March 5, 2021. JA 553, 560.

## SUMMARY OF ARGUMENT

In their closing and rebuttal arguments, prosecutors repeatedly made improper statements that violated Pineda's due process right to a fair trial.

First, in the government's initial closing argument, the prosecutor referred to facts not in evidence. The government did not offer any evidence at trial that the photos extracted from the Samsung phone found in the car depicted Pineda, nor did it offer evidence that the phone belonged to Pineda and not to the car's owner. It did not offer evidence that the arm tattoo shown in Government Exhibits 17E and 17H represented Mejia's and Pineda's initials. And it did not offer evidence that the arm tattoos in those photos were "fresh." Nevertheless, over Pineda's objection, the court allowed the prosecutor to argue that those two photos showed that Pineda had a "fresh" tattoo of Mejia's name on his arm two days before she accused him of kidnapping her. That argument presented the jury with facts that were outside the record. It was improper, and it so prejudicially impacted him that it denied him due process.

Second, in rebuttal argument, the prosecutor repeatedly opined that Mejia had told the truth. That amounted to improper prosecutorial vouching for a witness. While Pineda didn't object to this argument, prosecutorial witness-vouching is well-established misconduct, so the prosecutor's engaging in such misconduct amounts to plain error. As with the government's closing argument, this argument violated Pineda's substantial rights and impacted the outcome of the trial. And because

20

witness-vouching seriously affects the integrity of the judicial process, this Court must notice the error.

This Court should vacate Pineda's conviction and remand his case to the district court for a new trial.

## STANDARD OF REVIEW

This Court "review[s] a trial court's rulings on objections to closing arguments for abuse of discretion." *United States v. Saint Louis*, 889 F.3d 145, 156 (4th Cir. 2018) (citing *United States v. Green*, 599 F.3d 360, 370 (4th Cir. 2010)). "An error of law by a district court is by definition an abuse of discretion." *In re Wray*, 433 F.3d 376, 378 n.* (4th Cir. 2005). Whether a prosecutor has "made an improper statement" during closing argument is a question of law. *United States v. Collins*, 415 F.3d 304, 307 (4th Cir. 2005).

When the defendant fails to object to a statement made by the prosecutor in closing argument, this Court applies plain error review. *United States v. Woods*, 710 F.3d 195, 202 (4th Cir. 2013). Under plain error review, a defendant must show (1) an error; (2) that was plain; and (3) that affected his "substantial rights thereby impacting the outcome of his trial." *Id.* This Court may "decline to notice the error unless it seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *United States v. Gonzalez-Flores*, 701 F.3d 112, 115 (4th Cir. 2012)).

# **ARGUMENT**

**I.    The district court reversibly erred, in violation of due process, when it allowed the prosecutor to make closing arguments that repeatedly relied on facts not in evidence.**

While "great latitude is accorded counsel in presenting closing argument to a jury," "the guiding principle is that a prosecutor should not strike 'foul blows.'" *United States v. Ollivierre*, 378 F.3d 412, 418–19 (4th Cir. 2004), *cert. granted, judgment vacated on other grounds*, 543 U.S. 1112 (2005). Due process safeguards "against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978) (quoting *Estelle v. Williams*, 425 U.S. 501, 503 (1976)). Thus, a defendant has a "constitutional right" "to have his guilt or innocence determined solely on the basis of the evidence introduced at trial." *Id.* at 486. Furthermore, prosecutorial comment on evidence not before the jury "implicates the [defendant's] 6th Amendment confrontation rights." *United States v. Mitchell*, 1 F.3d 235, 241 (4th Cir. 1993).

Consequently, a prosecutor may not "portray as fact matters that are not in evidence," *Olliviere*, 378 F.3d at 418, and is "not at liberty to comment on facts not in evidence." *United States v. Lighty*, 616 F.3d 321, 361 (4th Cir. 2010). Indeed, it is a "fundamental rule, known to every lawyer, that argument is limited to the facts in evidence." *Id.* (quoting *United States ex rel. Shaw v. De Robertis*, 755 F.2d 1279, 1281 (7th Cir. 1985)). And as the Supreme Court long ago recognized, "improper suggestions, insinuations, and, especially, assertions of personal knowledge" by a federal

prosecutor "are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. 78, 88 (1935).

A prosecutor's misconduct in closing arguments is reversible error if the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Caro*, 597 F.3d 608, 624 (4th Cir. 2010). To establish a due process violation, the defendant must show: (1) that "the prosecutor's remarks or conduct were improper"; "and (2) that such remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial." *Id.*

### A.  The prosecutor's remarks were improper.

At closing, the prosecutor made improper arguments about the photos extracted from the Samsung phone (Exhibits 17 and 17A through 17J), asserting facts that had never been admitted into evidence. The only witness who testified about the contents of these exhibits was Roy Patterson, a digital forensic analyst who examined two phones recovered from the car that police towed from the scene. JA 347-368. Patterson couldn't testify to who owned the phone. JA 362. He merely testified that the images depicted in the exhibits were taken from a Samsung phone that he was asked to examine and that the dates on the images were May 19, 2019, and May 21, 2019. JA 351-362. Neither he nor any other witness identified the person or people depicted in the Exhibit 17 series of exhibits. No witness testified about whose tattooed arms and legs were shown in Exhibits 17 and 17A through 17H. No witness

testified about the meaning of the tattoos. And no witness testified about whether the arm tattoos shown in 17E and 17H were freshly made.

Nevertheless, in closing, the prosecutor argued that the "digital footprint trail" pointed to Pineda's guilt. JA 392. The only digital evidence the prosecutor referred to were "the photos from the defendant's phone[,]" which he argued showed that Pineda "was obsessed with Flor Mejia." JA 393. Then the prosecutor went further, saying: "There's a tattoo on or about May 19, which is two days before this kidnapping occurred, a fresh tattoo on the defendant's arm. You see the two initials. You see F--." JA 393.

At this point, Pineda's counsel objected on the grounds of "not in evidence," but the district court overruled the objection, even though no one had testified that (a) the phone was Pineda's; (b) the tattoo shown was on Pineda's arm; or (c) the tattoo was "fresh." *Id.* With the district court's approval, the prosecutor continued with the argument, saying, "You see the photograph, there is an F and there's an L. It is the government's contention that the F is for Flor, the L is for Luis, the defendant." JA 393-94. But again, the government had presented no evidence that the tattoo was on Pineda's arm or that the letters in the tattoo represented Pineda's and Mejia's initials. The government then used this argument about facts not in evidence to buttress "the testimony of the victim in which the defendant said, 'If I can't have you no one else can have you.'" JA 394.

Shortly after presenting the jury with these facts that were not in evidence, the government again argued "that three trails lead to the defendant," including "the digital footprint trail." JA 395. Then the government referred back to its argument about the tattoos to again buttress Mejia's testimony, saying, "She told you that her and the defendant had dated, but he was very jealous, he was very possessive as shown by the tattoos, and that if he couldn't have her, she testified, no one else could." JA 395. And it summed up its argument by repeatedly referring back to the photographs found on the phone as "the digital footprint that the defendant left"; "a digital calling card of his kidnapping which are photos on the phone"; and "the digital footprint, make a trail which leads to him." JA 397.

"By going outside the evidence" to argue that the phone belonged to Pineda, that the photos on the phone showed tattoos on Pineda's body, that the tattoo represented Pineda's and Mejia's initials, and that the tattoo on his arm was "fresh," "the 'prosecutor violated a fundamental rule, known to every lawyer, that argument is limited to the facts in evidence.'" *United States v. Wilson*, 135 F.3d 291, 298 (4th Cir. 1998). As in *Wilson*, '[h]ere, there was no basis from direct fact or reasonable inference" for the government's argument. *Id.*

In *Wilson*, the Court held that the prosecutor's argument was improperly based on facts not in evidence where, in a drug-trafficking trial, he argued that one of the defendants had committed a murder when he fired a gun at a car. *Id.* at 295. The evidence showed that after a drug sale, defendant Talley had shot at a car as it drove

away; that "the car slowed down 'like it had been hit,' 'wobbled,' then drove" away;
and that "the car was found later, about one-half mile away, off the road in the grass."
*Id.* at 298. This Court concluded that, while it might be permissible to infer that the
car or even the driver had been hit by gunfire, "[be]cause the government did not
establish a corpus delicti, the prosecutor could not fairly argue that Talley murdered
the driver of the car." *Id.* Consequently, "the prosecutor asserted something as fact
that had not been proved, and that was clearly improper." *Id.*

Similarly, the Sixth Circuit recently held that the prosecutor stated facts not in
evidence where he argued that items bought from a coconspirator during controlled
purchases were shown by testing to be fentanyl and carfentanil. *United States v. Hamm*,
952 F.3d 728, 740 (6th Cir.), *cert. denied*, 140 S. Ct. 2695, 206 L. Ed. 2d 837 (2020),
and *cert. denied sub nom. Shields v. United States*, 141 S. Ct. 312, 208 L. Ed. 2d 60 (2020).
The government had presented evidence of the controlled purchases from the
coconspirator, and it had presented evidence that a DEA chemist tested three bags of
drugs and determined that they contained fentanyl, heroin, and carfentanil. *Id.* But it
"neglected to introduce any evidence that the drugs [the DEA chemist] tested were
the same ones the Montgomery County Sheriff's Office bought from" the
coconspirator. *Id.* "The closing argument therefore stated facts not in evidence." *Id.*

In *Wilson* and *Hamm*, the government's proof left out one critical link in the
evidence, and the government was prohibited from providing that link in its closing
argument. In *Wilson*, it was the *corpus delicti*. In *Hamm*, it was evidence that the drugs

26

purchased from the coconspirator were the same drugs tested by the chemist. Here, the government left out not one, but at least four necessary links: first, evidence that the Samsung phone was Pineda's; second, that the tattooed body parts shown in the photos were Pineda's; third, that the tattoo represented Pineda's and Mejia's initials; and fourth, that the tattoos were "fresh." If the government was not permitted to provide *one* missing evidentiary link in closing argument in *Wilson* and *Hamm*, it certainly is not permitted to provide four, as it did here.

The government never presented evidence that the Samsung phone belonged to Pineda. Patterson couldn't testify to who owned the phone. JA 362. He testified that he observed other photographs depicting, as the government put it, "this person in the phone." JA 361. But he also testified that there were numerous pictures of other people on the phone as well, including selfies of a woman whom he did not attempt to identify. JA 364-65. And while the phone was found in the car that Mejia testified Pineda was driving, Patterson examined not one, but *two* phones found in the car that were not Mejia's. JA 349. Because the government presented evidence that the car was registered to another person whose passport was found in the car, the phone could have belonged to that person rather than Pineda. Govt. Exs. 8B, 8C. The government didn't present evidence specifically connecting Pineda to the Samsung phone, and "the prosecutor asserted something as fact that had not been proved." *Wilson*, 135 F.3d at 298.

27

The prosecutor strayed even farther from the evidence admitted at trial when he argued that the photos depicted tattoos on Pineda's body and that the tattoos depicted Pineda's and Mejia's initials. Again, the government had offered no evidence that these photos showed Pineda's arm. It offered no testimony from any witness who had ever seen this tattoo on Pineda's arm, nor did it offer any testimony or other evidence of what the tattoo meant.

And finally, the prosecutor was far outside the bounds of propriety when it argued that the tattoo was "fresh," which was the core of its argument that this tattoo demonstrated Pineda's "obsession" with Mejia. In order for the photo of this tattoo to aid the government's case, the tattoo had to be "fresh," because it would be unremarkable if Pineda had tattooed Mejia's initial on his arm while they were in a romantic relationship and living together. Yet establishing that a tattoo depicted in a photo is "fresh" would require the testimony of someone who either has knowledge of when the tattoo was made or has specialized knowledge and can testify as an expert based on the tattoo's appearance. The government could have presented such testimony. "Failing to do so, however, the Government was not permitted to make this argument during its [closing argument]. In short, the prosecutor was testifying." *United States v. Brown*, 765 F.3d 278, 296–97 (3d Cir. 2014).

Just as in *Wilson* and in *Hamm*, the government failed to present evidence necessary to make the arguments it presented in closing. It cannot "point to any competent evidence in the record verifying the asserted fact[s]." *United States v. Kuljko*,

28

___ F.4th ___, 2021 WL 2431827, at *4 (1st Cir. June 15, 2021). Consequently, the argument was improper, and the court erred when it overruled Pineda's objection.

### B. The prosecutor's improper remarks prejudiced Pineda and thus denied him a fair trial.

In determining whether a prosecutor's improper remarks "so prejudiced the defendant's substantial rights that the defendant was denied a fair trial," this Court considers six factors:

(1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the accused;

(2) whether the remarks were isolated or extensive;

(3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused;

(4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters;

(5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and

(6) whether curative instructions were given to the jury.

*United States v. Saint Louis*, 889 F.3d at 156-57 (quoting *United States v. Lighty*, 616 F.3d at 359, 361). "These factors should be 'examined in the context of the entire trial, and no one factor is dispositive.'" *United States v. Chong Lam*, 677 F.3d 190, 204 (4th Cir. 2012) (quoting *Lighty*, 616 F.3d at 361).

All six of these factors weigh toward a conclusion that the government's improper argument relying on facts not in evidence denied Pineda a fair trial.

First, the government's use of facts outside the record had a strong tendency to mislead the jury and prejudice Pineda, because the prosecutor used them as a tool to buttress Mejia's testimony that Pineda said, "If I can't have you no one else can have you." JA 394. The government could not obtain a conviction if the jury didn't believe Mejia's testimony, and her testimony contained numerous inconsistencies that, as the jury's later questions demonstrated, caused the jury to doubt her veracity. The government's argument amounted to the prosecutor's testimony—which Pineda had no opportunity to cross-examine—that Pineda had freshly tattooed Mejia's initial on his arm two days before the events that led to these charges. That argument had a strong tendency to mislead the jury into believing that such evidence existed and that Mejia's testimony was more credible than it otherwise might have appeared.

Second, the remarks were extensive. In a short closing argument that takes up only a little more than seven pages of the transcript, the prosecutor refers in five pages to Pineda's "digital footprint trail," which he describes as including the photo of "a fresh tattoo on the defendant's arm" "two days before he committed this kidnapping" depicting Pineda's and Mejia's initials. JA 392, 393-94, 395, 397. These were not passing references; they were an integral part of the government's argument.

Third, absent the remarks, the evidence against Pineda was not strong. The government's case hinged entirely on Mejia's credibility. Her testimony was inconsistent and, as the jury's questions to the judge demonstrated, sowed doubt in the jurors' minds. And while Rudy Aguilar testified that Pineda said, "It was a miracle

30

from God that he did not kill her," Aguilar also said, "I don't know if he was joking

or if he was saying the truth." JA 376. In the context of a conversation where

Pineda also told Aguilar that he and Mejia "sometimes would fight and get

into arguments," JA 374, that is hardly a confession to kidnapping. It could

just as easily be a joking reference to the fact that Pineda and Mejia had a stormy

relationship and fought a lot. People commonly use the word "kill" in

terms of expressing extreme anger without any actual intent to kill. "(One) is

going to kill (someone)," *The Free Dictionary by Farlex*, available online at

https://idioms.thefreedictionary.com/I%27m+going+to+kill (last accessed June 30,

2021).

Fourth, the comments could only have been delivered to divert the jury's

attention to extraneous matters—that is, facts that were not in evidence. Indeed, the

comments had a two-fold purpose: to direct the jury's attention toward facts not in

evidence and to direct its attention away from the inconsistencies in Mejia's testimony.

Fifth, the prosecutor's comments were not invited by any improper conduct of

defense counsel. Defense counsel had not even offered closing argument at the time

the prosecutor made the comments.

And sixth, the district court didn't give any curative instructions to the jury.

Instead, it overruled Pineda's objection to the argument. "By overruling the objection,

the court naturally left the jurors with the impression that the prosecutor's"

representation of the evidence was "proper." *United States v. Velazquez*, ___ F.4th ___,

31

2021 WL 2559474, at *6 (9th Cir. June 23, 2021). Furthermore, the court never

instructed the jury that statements and arguments of counsel are not evidence in the

case. JA 384-390; 410-420.

Finally, in the context of the trial as a whole, the Court also should consider

that another prosecutor in rebuttal made additional, impermissible statements

vouching for Mejia's credibility, and that all of the government's improper statements

in closing and rebuttal were designed to buttress the credibility of its key witness. All

of these factors, considered together, demonstrate that under the particular

circumstances of this case, the government's reliance on facts not in evidence to

buttress Mejia's testimony during its closing argument deprived Pineda of a fair trial.

This alone is reason for this Court to vacate Pineda's conviction and remand for a

new trial.

## II. The district court plainly erred when it allowed the prosecutor to vouch for Mejia's credibility in closing argument.

But there is more. In the government's closing rebuttal argument, the

prosecutor engaged in a new brand of improper argument: vouching for the

government's key witness. Generally, when determining whether a prosecutor's

argument is reversible error due to improper witness-vouching, the analysis is the

same as for any allegation of improper prosecutorial argument. First, the court

determines "whether [the] statement constitutes improper vouching for the credibility

of a witness." *United States v. Collins*, 415 F.3d at 307. "If so," then the Court must

determine whether the prosecutor's remarks "prejudicially affected [the Defendant's] substantial rights so as to deprive him of a fair trial." *Id.* (quoting *United States v. Scheetz*, 293 F.3d 175, 185 (4th Cir. 2002)). Since defense counsel did not object to the prosecutor's rebuttal argument, however, "the ordinary test for reversal based on improper argument is augmented in that [the defendant] must also show that the impropriety of the argument was plain." *United States v. Smith*, 441 F.3d 254, 264 (4th Cir. 2006). Additionally, if Pineda establishes that the error was plain, "the court retains discretion to decline to notice the error," *id.,* "unless it seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Woods*, 710 F.3d at 202. Pineda satisfies these requirements for showing that the government's rebuttal argument created reversible, plain error.

### A. The prosecution improperly vouched for its own witness.

The Supreme Court has explained that a "prosecutor's vouching for the credibility of witnesses and expressing [her] personal opinion concerning the guilt of the accused" is dangerous for two reasons. *United States v. Young*, 470 U.S. 1, 18 (1985). First, "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Id.* And second, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id.* at 18-19. This Court has

expressed similar concerns that a prosecutor's "comments on the veracity of a witness" presents risks "(1) of improperly suggesting to the jury that the prosecutor's personal opinion has evidentiary weight; and (2) of improperly inviting the jury to infer that the prosecutor 'had access to extra-judicial information, not available to the jury.'" *United States v. Woods*, 710 F.3d at 203 (quoting *United States v. Moore,* 710 F.2d 157, 159 (4th Cir. 1983)).

Consequently, this Court has "held that it is error for the government to bolster or vouch for its own witnesses." *Lighty*, 616 F.3d at 359 (citing *United States v. Samad*, 754 F.2d 1091, 1100 (4th Cir. 1984)). A prosecutor improperly vouches for a witness when her "actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness." *Id.* (citing *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1993)). "[A]mong other things," a prosecutor may not "make explicit personal assurances that a witness is trustworthy." *Id.* A prosecutor's argument that a government witness told the truth is an impermissible "statement of personal belief." *See, e.g., United States v. Williams*, 112 F. App'x 581, 582 (9th Cir. 2004) (prosecutor improperly vouched for witness by saying, "This officer didn't commit perjury. He came in here and told you the truth about what happened."). Conversely, a prosecutor's statement that the defendant "lied about it under oath" is also a "statement of personal belief" that "jeopardizes the integrity of the trial process." *Woods,* 710 F.3d at 202-03.

Consistent with *Woods*, the First Circuit has held that the prosecutor's statement "is unmistakably the personal opinion of the prosecutor as to the honesty of a witness and constitutes improper vouching," where the prosecutor asks the rhetorical questions, "Was [the passenger] credible? Was he honest? Of course, he was." *United States v. Rodriguez-Adorno*, 695 F.3d 32, 40-41 (1st Cir. 2012); *see also United States v. Wihbey*, 75 F.3d 761, 772 (1st Cir. 1996) ("prosecutor's statement that 'what they have done is testify truthfully' was inappropriate"); *United States v. Kerr*, 981 F.2d 1050, 1052 (9th Cir. 1992) (prosecutor's statement that witness "was candid with you folks" is improper vouching). As the Ninth Circuit explained in *Kerr*, "[a] prosecutor has no business telling the jury his individual impressions of the evidence. Because he is the sovereign's representative, the jury may be misled into thinking his conclusions may have been validated by the government's investigatory apparatus." 981 F.2d at 1053.

The prosecutor here violated this prohibition by personally vouching for the government's key witness twice in her rebuttal argument. First, she told the jury that Mejia "sat on this witness stand. She put her hand on this Bible, and she told you the truth." JA 408. And she did it a second time when she told the jury that Mejia's inconsistent statements demonstrated her truthfulness "[b]ecause when you're telling the truth about something that happened a year ago you should have faded memory." *Id.* (emphasis added). Then in her parting remarks to the jury, she summed up by directing the jury's attention back to her previous assertion that Mejia told the truth by

35

saying, "your verdict must be based on the truth. And the truth is that Luis Pineda kidnapped Flor Mejia on May 21, 2019," which is the version of events that Mejia testified to at trial. JA 410. These prosecutorial assurances that Flor Mejia was being truthful in her testimony are error under *Lighty* and *Woods*, as well as *Rodriguez-Adorno*, *Wihbey*, and *Kerr*.

### B. The error is plain.

"An error is plain if it is 'clear or obvious, rather than subject to reasonable dispute.'" *United States v. Johnson*, 945 F.3d 174, 179 (4th Cir. 2019), *cert. denied*, 141 S. Ct. 255 (2020) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)). The illegality of witness-vouching prosecutorial arguments is well-established in both the Supreme Court and this Court. *Young*, 470 U.S. 1, 18; *Lighty*, 616 F.3d at 359; *United States v. Johnson*, 587 F.3d 625, 632 (4th Cir. 2009); *United States v. Sullivan*, 455 F.3d 248, 259 (4th Cir. 2006). Furthermore, whether the jury could have reasonably believed that the prosecutor was indicating her personal belief in Mejia's credibility, *see Lighty*, 616 F.3d at 359, is not subject to reasonable dispute here: the prosecutor personally and explicitly told the jury that the witness told the truth. The law prohibited her from making that personal assurance. The error is plain.

### C. The error denied Pineda a fair trial.

Furthermore, the prosecutor's repeated vouching prejudiced Pineda and denied him a fair trial. As with the prosecutor's improper argument detailed in Section I, in

assessing whether the prosecutor's improper witness-vouching deprived Pineda of a fair trial, the Court should consider:

> (1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the accused;
>
> (2) whether the remarks were isolated or extensive;
>
> (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused;
>
> (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters;
>
> (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and
>
> (6) whether curative instructions were given to the jury.

*Saint Louis*, 889 F.3d at 156-57 (quoting *Lighty*, 616 F.3d at 359, 361). And it must consider these factors in the context of the entire trial. *Chong Lam*, 677 F.3d at 204 (quoting *Lighty*, 616 F.3d at 361).

First, as with the prosecutor's improper references to facts not in evidence, these six factors demonstrate that the prosecutor's improper vouching, especially when combined with the government's previous improper argument based on facts not in evidence, deprived Pineda of a fair trial. The prosecutor's improper vouching had a high tendency to mislead the jury into believing that the prosecutor had access to evidence they didn't know about and to cause them to trust her endorsement of Mejia's testimony as evidence. *Young*, 470 U.S. at 18-19; *Woods*, 710 F.3d at 203. That's why the Supreme Court and this Court ban witness-vouching in the first place. And

considering that the prosecution improperly relied on facts not in evidence in its initial closing argument, the tendency of the improper vouching to mislead the jury into believing that the government had access to evidence that the jurors didn't know about is multiplied.

Second, the remarks were not isolated during the government's short rebuttal argument, which takes up only four-and-a-half pages of transcript. Halfway through that short argument, the prosecutor told the jury that Mejia "put her hand on this Bible, and she told you the truth," and she returned to that theme twice, telling the jury that Mejia's prior statements were inconsistent "[b]ecause when you're telling the truth about something that happened a year ago you should have faded memory," and recalling that endorsement to the jury's mind by closing with the argument that "the truth is that Luis Pineda kidnapped Flor Mejia on May 21, 2019." JA 408, 410. In the context of a short rebuttal argument, the comments were extensive.

Third, as explained in Section I., the proof against Pineda was not strong. The government's key witness had used an alias and fake identification, JA 175, her statements were inconsistent, and the jury's questions demonstrated that it had doubts about her testimony. Pineda's statement to Aguilar that the government attempted to cast as incriminating, JA 396, did not mention kidnapping at all, and Aguilar testified that Pineda may have been joking when he said it.

Fourth, the prosecutor didn't make the comments by accident. Her emphasis on and repetition of her opinion that Mejia was telling the truth and that her story was

38

the truth demonstrate a deliberate choice to emphasize her opinion of Mejia's truthfulness.

Fifth, the prosecutor's statements were not invited by any improper conduct by the defense. Defense counsel properly discredited Mejia's testimony by drawing the jury's attention to her initially false testimony about using a fake name and identification and by pointing out the inconsistencies in her story.

And finally, the district court gave no curative instructions to the jury. Nor did it instruct the jury that statements and arguments of counsel are not evidence in the case. JA 384-390; 410-420.

All of these factors together, in the context of the trial as a whole, demonstrate that the government's improper vouching for Mejia's credibility deprived Pineda of a fair trial and affected his substantial rights.

### D.     The Court must notice the error.

Finally, this Court has held that "any statement of personal belief jeopardizes the integrity of the trial process." *United States v. Loayza*, 107 F.3d 257, 262 (4th Cir. 1997) (quoting *United States v. Harrison*, 716 F.2d 1050, 1052 (4th Cir. 1983)). The Court may "decline to notice the error unless it seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Woods*, 710 F.3d at 202. Thus, because the government's repeated vouching for Mejia's testimony seriously affects the integrity of judicial proceedings, the Court must notice the error.

## **<u>CONCLUSION</u>**

For the foregoing reasons, this Court should vacate Pineda's conviction and remand to the district court for a new trial.

## **<u>REQUEST FOR ORAL ARGUMENT</u>**

Pineda respectfully requests oral argument, because this case presents serious questions about the propriety of the government's closing arguments, and a published opinion would be helpful.

DATED this 9th day of July, 2021.

Respectfully submitted,

Anthony Martinez
Federal Public Defender for the
Western District of North Carolina

/s/Ann L. Hester
Ann L. Hester
Assistant Federal Public Defender
129 W. Trade St., Suite 300
Charlotte, NC 28202
(704) 374-0720
*Attorneys for Appellant*

40

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    [ X ] this brief contains [*10,653*] words.

    [    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.     This brief complies with the typeface and type style requirements because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Garamond*]; *or*

    [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated:   July 9, 2021           /s/ Ann L. Hester          
                                      *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 9th day of July, 2021, I caused this Brief of

Appellant and Joint Appendix to be filed electronically with the Clerk of the Court

using the CM/ECF System, which will send notice of such filing to the following

registered CM/ECF users:

> Amy E. Ray
> OFFICE OF THE U.S. ATTORNEY
> 100 Otis Street, Room 233
> Asheville, North Carolina  28801
> (828) 271-4661
>
> *Counsel for Appellee*

I further certify that on this 9th day of July, 2021, I caused a copy of the Sealed

Volume of the Joint Appendix and Exhibit Volume on CD to be served, via UPS

Ground Transportation, upon counsel for the Appellee, at the above address.

/s/ Ann L. Hester
*Counsel for Appellant*