IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 21-4109

———————————

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

LUIS ANALBERTO PINEDA ANCHECTA,

*Defendant – Appellant.*

———————————

Appeal from the United States District Court
for the Western District of North Carolina

*The Honorable Robert J. Conrad Jr., District Judge*

———————————

BRIEF OF THE UNITED STATES

———————————

William T. Stetzer                Anthony J. Enright
Acting United States Attorney     Assistant United States Attorney
                                  United States Attorney's Office
                                  227 West Trade Street
                                  Carillon Building, Suite 1650
                                  Charlotte, North Carolina 28202
                                  (704) 344-6222

*Attorneys for the United States of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................iii

JURISDICTIONAL STATEMENT .........................................................1

ISSUE PRESENTED ...............................................................................1

STATEMENT OF THE CASE ................................................................2

      A.    Pineda's ex-girlfriend escapes after Pineda ties her up,
            threatens to kill her, and drags her into the woods. ..............2

      B.    A jury convicts Pineda of kidnapping. ....................................7

SUMMARY OF THE ARGUMENT ........................................................30

ARGUMENT

      The United States' closing argument was proper. ........................32

      A.    Standard of Review ................................................................32

      B.    Discussion...............................................................................34

            1.    The United States did not engage in misconduct when
                  it argued about Pineda's tattoos.... ..............................37

                a.    Pineda cannot establish that the United States
                    made improper remarks during its initial closing
                    argument...............................................................38

                b.    Pineda cannot establish that the prosecutor's
                    remarks prejudiced him or deprived him of a fair
                    trial... ...................................................................48

c. Pineda cannot establish that the comments to which he failed to object satisfy the elements of the plain-error standard........................................................ 56

2. The prosecutor did not engage in misconduct by discussing the truth during rebuttal...... .................... 58

a. The United States did not improperly vouch for Mejia's credibility by referring to the truth during its rebuttal argument.................................... 59

b. Pineda cannot establish that the United States' references to the truth prejudiced him or deprived him of a fair trial... ................................ 67

c. Pineda cannot establish a plain error.................... 74

CONCLUSION ..................................................... 77

REQUEST FOR DECISION ON THE BRIEFS WITHOUT ORAL ARGUMENT ........................................... 77

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Bates v. Lee,*
  308 F.3d 411 (4th Cir. 2002) ....................................................... passim

*Berger v. United States,*
  295 U.S. 78 (1935) ................................................................................34

*Olliverre v. United States,*
  543 U.S. 1112 (2005) ...........................................................................35

*Richardson v. Marsh,*
  481 U.S. 200 (4th Cir. 2012)................................................................55

*United States v. Adam,*
  70 F.3d 776 (4th Cir. 1995) ...............................................33, 34, 36, 57

*United States v. Alexander,*
  741 F.3d 866 (7th Cir. 2014) ........................................................63, 67

*United States v. Benson,*
  957 F.3d 218 (4th Cir. 2020) ...................................................... passim

*United States v. Brown,*
  765 F.3d 278 (3d Cir. 2014)...........................................................46, 47

*United States v. Campbell,*
  347 F. App'x 923 (4th Cir. 2009) .......................................61, 64, 66, 75

*United States v. Chong Lam,*
  677 F.3d 190 (4th Cir. 2012) ...................................................55, 56, 73

*United States v. Cordova,*
   186 F. App'x 742 (9th Cir. 2006) .................................................. 66, 67

*United States v. Cottier,*
   908 F.3d 1141 (8th Cir. 2018) ...................................................... 63, 66

*United States v. Davis,*
   855 F.3d 587 (4th Cir. 2017) ............................................. 34, 57, 74, 75

*United States v. Finch,*
   16 F.3d 228 (8th Cir. 1994) ................................................................. 62

*United States v. Francisco,*
   35 F.3d 116 (4th Cir. 1994) ......................................................... 38, 54

*United States v. Grigsby,*
   338 F. App'x 514 (6th Cir. 2009) ................................................ 64, 67

*United States v. Hamm,*
   952 F.3d 728 (6th Cir. 2020) ....................................................... 46, 47

*United States v. Hylor,*
   353 F. App'x 361 (11th Cir. 2009) .............................................. 62, 67

*United States v. Jones,*
   471 F.3d 535 (4th Cir. 2006) .................................................. 64, 66, 75

*United States v. Kerr,*
   981 F.2d 1050 (9th Cir. 1992) ............................................................ 65

*United States v. Lewis,*
   10 F.3d 1086 (4th Cir. 1984) ............................................................. 60

*United States v. Lighty,*
   616 F.3d 321 (4th Cir. 2020) ..................................................... passim

*United States v. Lopez,*
  590 F.3d 1238 (11th Cir. 2009) ........................................... 64

*United States v. Ollivierre,*
  378 F.3d 412 (4th Cir. 2004) ..................................... passim

*United States v. Partida,*
  842 F. App'x 63 (9th Cir. 2021) ......................................... 66

*United States v. Phea,*
  755 F.3d 255 (5th Cir. 2014) ............................................ 66

*United States v. Rivas,*
  493 F.3d 131 (3d Cir. 2007) ............................................. 67

*United States v. Robinson,*
  485 U.S. 25 (1988) .................................................. 61, 67

*United States v. Rodriguez-Adorno,*
  695 F.3d 32 (1st Cir. 2012)............................................. 65

*United States v. Saint Louis,*
  889 F.3d 145 (4th Cir. 2018) ........................................... 32

*United States v. Sanchez,*
  118 F.3d 192 (4th Cir. 1997) ........................................... 64

*United States v. Scheetz,*
  293 F.3d 175 (4th Cir. 2002) ..................................... passim

*United States v. Tzeuton,*
  370 F. App'x 415 (4th Cir. 2010) ................................. 34, 67

*United States v. Vazquez-Larrauri,*
  778 F.3d 276 (1st Cir. 2015)............................. 65, 66, 75, 76

*United States v. Webb,*
965 F.3d 262 (4th Cir. 2020) .............................................. 48, 57, 63, 76

*United States v. Wihbey,*
75 F.3d 761 (1st Cir. 1996)................................................................ 65

*United States v. Wilkes,*
662 F.3d 524 (9th Cir. 2011) ....................................................... 61, 66

*United States v. Williams,*
112 F. App'x 581 (9th Cir. 2004) ...................................................... 65

*United States v. Wilson,*
135 F.3d 291 (4th Cir. 1998) ..................................................... passim

*United States v. Young,*
470 U.S. 1 (1985) ....................................................................... passim

## Statutes

18 U.S.C. § 1201(a)(1).........................................................................7

18 U.S.C. § 3231 .................................................................................1

28 U.S.C. § 1291 .................................................................................1

## Rules

Fed. R. Crim. P. 51(b)........................................................................33

## JURISDICTIONAL STATEMENT

Luis Analberto Pineda Anchecta challenges his kidnapping conviction.   A statute, 18 U.S.C. § 3231 conferred jurisdiction on the United States District Court for the Western District of North Carolina (Hon. Robert J. Conrad Jr., J.).   Pineda filed a timely notice of appeal, J.A. 553, 560, and this Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUE PRESENTED

The United States argued in closing that a series of images, on a phone containing Pineda's picture found on Pineda's seat, depicted Pineda's fresh tattoos of the initials "F" and "L."   And, in response to the defendant's argument that a witness "lied," the United States argued the witness told the truth, describing the evidence demonstrating her truthfulness.   Did the United States commit prosecutorial misconduct that denied Pineda a fair trial?

## STATEMENT OF THE CASE

**A.    Pineda's ex-girlfriend escapes after Pineda ties her up, threatens to kill her, and drags her into the woods.**

On May 29, 2019, Pineda went to the apartment where his ex-girlfriend, Flor Mejia, lived with her son.   J.A. 152–58.   Pineda and Mejia had dated for a time after she came to the United States from her home country of Honduras, but they eventually broke up.   J.A. 150–52, 162.   Pineda was in a silver Ford Fusion, and in the back was a spool of muletape, a kind of rope he had used when installing fiber-optic cable for AT&T.   J.A. 122, 124–25, 138, 217–18, 223–24, 243, 372.   With him was another individual, who covered his face.   J.A. 153, 156, 160–61.

Mejia left her apartment around 9 p.m. to retrieve her purse from her car.   J.A. 152–53.   She called her son when she left the apartment, but he was talking to his grandmother on the phone and did not know she was leaving.   J.A. 172.

When Mejia stepped outside, Pineda's companion grabbed her hands and, with Pineda's help, threw her into the Ford Fusion Pineda drove.   J.A. 153–61.   She screamed.   J.A. 153–56.   Mejia's son heard

2

a scream outside, but he gave it little attention because he was on the phone with his grandmother.  J.A. 196.  Pineda stuffed a cloth in Mejia's mouth.  J.A. 156–58.

Pineda used muletape to tie Mejia's neck and her hands.  J.A. 112, 123–24, 157–162, 123, 138.  Pineda told her she was being "kidnapped."  J.A. 157–58.  The man with the covered face was not in the car.  J.A. 159.

Pineda drove Mejia to a wooded area near where he had previously gone fishing with Mejia's son.  J.A. 121–25, 135, 161, 201–02.  He held the rope while driving.  J.A. 161.  And he kissed Mejia repeatedly, against her wishes.  J.A. 163–64.

Pineda told Mejia he was "going to kill" her.  J.A. 162, 173–174. "[I]f you're not going to be mine," he told her, "you're not going to be with anybody."  J.A. 163.  He told her that he had made a pact with "Santa Muerte."  J.A. 163.

Pineda stopped the car; dragged Mejia into the woods, still tied up; and threw her to the ground.  J.A. 165–66.  He got on top of her and held her neck with one hand as she struggled against him.  J.A. 166–

3

67.   With his other hand he tried to unbutton her shorts.   J.A. 165.
He repeated "that he had made a pact with the Saint of Death that he
was going to kill" her.   J.A. 165.

Mejia fled when Pineda fell down.   J.A. 166–67.   She pulled off
the muletape and ran to the middle of the street where she yelled for
help.   J.A. 167–68.

Two women on their way home from work — Brittany Gambrell
and Taylor Larsen — stopped to help Mejia.   J.A. 110–12.   Mejia is a
native Spanish speaker with limited knowledge of English. 171–72.
But she made gestures toward her throat and said, "policia, policia."
J.A. 111–13.   Gambrell called 911.   J.A. 112.

Mejia's son did not know where Mejia had gone.   J.A. 172–73.
Mejia was unable to retrieve her phone from the Ford Fusion because it
was locked.   J.A. 172–73.

Officers arrived at the scene, including Detective Kevin Crespi of
the Charlotte-Mecklenburg Police Department, whose body camera was
active.   J.A. 122; 130, 596 (Gov't Ex. 9A).   Detective Crespi's
knowledge of Spanish was limited.   J.A. 141.   But Mejia

4

communicated using her hands.   J.A. 13.   Mejia pointed Detective
Crespi to the Ford parked on the side of the road.   J.A. 122–23.

Mejia repeatedly pointed toward a wooded area nearby, where
Detective Crespi could see the muletape.   J.A. 123.   Mejia pointed to
the muletape, then put her hands up to her neck, indicating "that she
was strangled."   J.A. 123–24.   The detective could see abrasions on
Mejia's neck.   J.A. 123.

"[E]x-novio," said Mejia.   J.A. 124–25.   Detective Crespi
remembered some Spanish from high school.   J.A. 124.   He understood
that she was referring to an ex-boyfriend, and he determined that a
domestic assault had occurred.   J.A. 124.

A Spanish speaking police officer and paramedics arrived.   J.A.
173, 192.   Mejia told a paramedic, who spoke to her using a translation
service, that she had "been strangled."   J.A. 208.   She told the officer
that something had been stuffed in her mouth.   J.A. 208.   A paramedic
saw the abrasions on Mejia's neck and placed a cervical collar around
Mejia's neck to stabilize it.   J.A. 207–08.   The paramedic took her to
the hospital in an ambulance.   J.A. 211.

The Ford Fusion was towed to the police station and searched. J.A. 220, 236–47.   A crime-scene specialist used a tool to open the locked car.   J.A. 239.   On the driver's seat were two cell phones.   J.A. 242.   Both of them contained images of "the defendant himself."   J.A. 359–62, 490, 596 (Gov't Ex. 17J); *see also* J.A. 566.   And one of them contained, along with Pineda's image, images of a series of tattoos — in the words of Pineda's post-trial brief, "Mr. Pineda's tattoos."   J.A. 436. Also in the car were Mejia's phone and a spool of mule tape.   J.A. 241–47, 249–50.

Mejia spoke to a number of people about the events of May 21, including police detectives, medical personnel, prosecutors, and others. J.A. 192–93.   She told all of them "what Luis Pineda" did to her.   J.A. 193.

A few weeks after May 21, Pineda spoke to Rudy Aguilar about Mejia.   J.A. 369, 372–73.   Pineda told him that Mejia had accused Pineda of domestic violence.   J.A. 374.   "It was a miracle from God," said Pineda, "that he did not kill her."   J.A. 376.

6

### B.    A jury convicts Pineda of kidnapping.

A grand jury in the Western District of North Carolina charged Pineda with kidnapping and attempted kidnapping, 18 U.S.C. § 1201(a)(1).   J.A. 9.   Pineda pleaded not guilty.   J.A. 3.

Before the trial jury heard any arguments or evidence, the district court instructed the jury that it was obligated to find facts solely from the "evidence," which it defined.   J.A. 95, 98.   "The evidence from which you will find the facts," the court instructed, "will consist of the testimony of witnesses, documents and other things received into the record as exhibits, and any facts that the lawyers agree to or stipulate to or that the court may instruct you to find."   J.A. 95–96.   "You as jurors must decide this case based solely on the evidence presented here in this courtroom," said the court.   J.A. 98; *see also* J.A. 95.

After instructing the jury that it was to find facts from the evidence, it instructed the jury not to consider the "statements," "arguments," or questions of "lawyers" as "evidence":

> Certain things are not evidence and must not be considered by you as evidence.   They include things like statements, arguments and questions by lawyers, objections to questions are not evidence.

7

J.A. 96.   The court also instructed jurors, "[Y]ou are the sole judges of the credibility of the witnesses, and the weight their testimony deserves."   J.A. 96.

Brittany Gambrell testified about encountering Mejia in the road while driving home from work.   J.A. 110–11.   Gambrell described Mejia as "in distress" and explained that she repeatedly made a motion "like she was reaching for her throat."   J.A. 112.   Gambrell thought she saw somebody else run off before she stopped her car.   J.A. 114. The jury heard a recording of Gambrell's 911 call.   J.A. 109, 596 (Gov't. Ex. 1A).

Detective Crespi described communicating with Mejia that night and investigating the scene.   J.A. 118–141.   The jury saw this photograph, among others, of the muletape Mejia pointed the detective to in the woods:

8



J.A. 125–26, 596 (Gov't Ex. 5C).

The jury saw footage from Detective Crespi's body camera.   J.A.
130, 596 (Gov't Ex. 9A).   The footage depicts some of Detective Crespi's
encounter with Mejia, her demeanor, the rope in the woods, and her
efforts to communicate what happened and where her assailant went.
J.A. 596 (Gov't Ex. 9A).   In addition to describing Mejia's hand gestures
indicating that she had been strangled, Detective Crespi testified that
he saw visible redness and scratches on Mejia's neck.   J.A. 123.   He
also saw scratches on her lower legs.   J.A. 123.

Detective Crespi described what he saw in the locked Ford to which Mejia had directed him.    J.A. 132–33.    Multiple cell phones, the detective explained, were in the front of the car.    J.A. 132–33.    "The white plastic cord that she was pointing to," he further testified, "[t]here was a big bundle of it on the back seat on the floor."    J.A. 138.    The jury saw a photograph of the spooled bundle.    J.A. 139, 596 (Gov't Ex. 5E).

The jury also heard from Mejia, who described her experience with an interpreter.    J.A. 149–73.    Mejia testified that she had left her house initially to retrieve her purse from the car.    J.A. 152.    The United States asked, "When you left your house, did you tell your son you were leaving?"    J.A. 172.    "I called him," replied Mejia, "[b]ut he was talking to my mom on the phone."    J.A. 172.    He did not know she was leaving.    J.A. 173.

Mejia described being grabbed and thrown into the car.    J.A. 152–56.    She was not able to identify Pineda's cohort because his face was covered.    J.A. 152–56.    After she was in the car, Mejia explained, Pineda used the kind of rope that she had previously seen from Pineda's

10

work to tie her hands and her neck.   J.A. 157–162.   And she described his threats to kill her.   J.A. 162, 173–74. 173–74.   Asked if she believed Pineda "when he said he would kill" her, Mejia replied, "Yes." J.A. 163.

Mejia testified that Pineda got on top of her after he stopped the car; dragged her into the woods, still tied up; and threw her to the ground, and she explained that she fled when Pineda fell down.   J.A. 165–66.   "I don't know how it was that he fell down," said Mejia, later explaining that he "got tied up with something."   J.A. 166–67.   "[A]nd that's when I was able to flee."   J.A. 166.

On cross examination, defense counsel asked Mejia if she had told "the government that" she was "using a fake North Carolina ID."   J.A. 174.   "No," replied Mejia.   J.A. 174.   "And that the ID traces back to a dead woman," continued defense counsel.   J.A. 174.   "No," replied Mejia.   J.A. 174.   "You were using the name Estrella Murcia," said defense counsel.   J.A. 174.   "Estrella, I used that for my entire life since I was young," explained Mejia, "but not without ID."   J.A. 175. She acknowledged that people at her job knew her as "Estrella."   J.A.

11

180.   Asked if the place where she worked as a painter "knew [her] as" Estrella "Mauricia" or "Murcia," however, Mejia replied, "No."   J.A. 175.   Defense counsel then showed Mejia an "identification card" with the name "Estrella Murcia."   J.A. 175.   Mejia agreed that the document was her "ID."   J.A. 175.   She explained she had obtained it at a time she did not have her passport.   J.A. 175.   The card itself was not admitted into evidence.   J.A. 176.

The jury also heard from Mejia's son, J.A. 196–202, a paramedic who described putting a cervical collar around Mejia's neck after seeing abrasions on it, J.A. 205–210, and a crime-scene specialist who documented the scene and collected evidence, J.A. 212–30.   The jury saw photographs of Mejia's injuries, J.A. 225–30, including this photograph of Mejia's neck:



J.A. 227, 596 (Gov't Ex. 16E).

Another crime-scene specialist testified about items collected from the Fusion, including the two phones she collected from the driver's seat after using a tool to open the locked car. J.A. 236–47. The jury saw an image of the back seat of the car depicting the muletape spool and a blue-and-white case of Modelo beer:

13



J.A. 242–243, 596 (Gov't Ex. 5E).

Roy Patterson, a digital forensic analyst with the Charlotte-Mecklenburg Police Department testified about a series of ten photographs recovered from one of the two phones collected from the driver's seat of the Fusion, a Samsung phone.    J.A. 347–356.    In the phone was date and time information for the images, which he recorded in a report, and he described each image's timestamp in turn.    J.A. 352–53, 357–60, 596 (Gov't Ex. 17).    The first eight images were dated May 19, 2019, and the timestamps progress chronologically.    J.A. 359–

60.    The first image has a timestamp of "4:44:16."    J.A. 359.    The

second has a timestamp of "5:20:14."    J.A. 359.    The third has a

timestamp of "6:43:41," and so on, until the final image dated May 19,

which has a timestamp of "10:48:03" p.m.    J.A. 359–60.    The final two

images were dated May 21, 2019.    J.A. 359–60.

   Each of the eight images dated May 19 depicts a tattoo.    J.A. 356,

596 (Gov't Ex. 17A–17H).    The jury saw each image.    J.A. 356.

   An image timestamped 5:20:14 p.m. depicts a phone that, in turn,

depicts a tattoo captioned "San La Muerte," and an image timestamped

6:43:41 p.m. depicts a gloved hand applying a similar tattoo to a leg:

 

J.A. 359–60, 490, 596 (Gov't Ex. 17A, 17B).

An image timestamped at 7:41 p.m. — about an hour after the timestamp of the leg-tattoo-in-progress image — depicts a gloved hand, speckled with ink, holding a wrist with the outline of a tattoo.   J.A. 359, 596 (Gov't Ex. 17C).   An image timestamped about 20 additional

16

minutes later depicts a wrist tattoo filled with ink and accompanied by

blood:



J.A. 359–60, 596 (Gov't Ex. 17C, 17D).

Four images of tattoos are timestamped between 10:00 and 11:00

p.m. on May 19, 2019.   J.A. 360.   Two images respectively depict a

completed leg and wrist tattoo:

17



J.A. 359–60, 596 (Gov't Ex. 17F, 17G).   Two images depict an arm

tattoo:

18



J.A. 359–60, 596 (Gov't Ex. 17E, 17H).   The first of these arm-tattoo

images bears a timestamp within one minute of the timestamps on the

leg and wrist images.   J.A. 360.   The second bears a timestamp of

10:48 p.m., about a half-hour later.   J.A. 360.

The two remaining images from the series of ten were dated May

21, 2019 — the day of the events described by Mejia and two days after

19

the date on the eight images of tattoos.    J.A. 360.    The first image

depicts a case of Modelo beer and car upholstery; the second image

depicts "the defendant himself," J.A. 490:



J.A. 359–60, 490, 596 (Gov't Ex. 17I, 17J); *see also* J.A. 566.    Patterson

testified that other images found on both the Samsung phone and the

20

second phone recovered from the driver's seat also depicted the same individual.   J.A. 359–62.

On cross examination, Patterson testified that the report prepared with the extraction tool he used sometimes contains a "date created" field, because some files have that information and others do not.   J.A. 363.   The images he discussed did not have a "date created."   J.A. 363. He testified that he did not know when the images were created, who took the images, or who sent them.   J.A. 363–64.   He agreed with defense counsel's characterization of his "job" as "just to see what's on the phone and provide that information."   J.A. 364.

The jury also heard from Rudy Aguilar, who, like Pineda, had installed cable for AT&T.   J.A. 369–70.   He identified the rope depicted in the photograph of the back of the Ford Fusion as something he and Pineda had used when installing cable.   J.A. 243, 371–72, 596 (Gov't Ex. 8E).

Aguilar testified that Pineda had showed him a tattoo he had on his leg of "The Santa Muerte."   J.A. 374–75.   He also explained that he had spoken with Pineda about Mejia in June of 2019.   J.A. 372–73.

Aguilar testified that Pineda told him that Mejia had accused him of domestic violence and that "[i]t was a miracle from God that he did not kill her."   J.A. 374–76.   "I don't know if he was joking or if he was saying the truth," said Aguilar.   J.A. 376.   The United States asked Aguilar whether he had made several specific statements during interviews with law-enforcement officers, and Aguilar responded that he did not remember the statements.   J.A. 376–77.   Asked if he had received any threats for testifying that day, Aguilar replied, "No, sir." J.A. 379.   But he agreed that he told "law enforcement officers that" he had "been threatened."   J.A. 379.

Pineda did not introduce any evidence.   J.A. 381–82, 384.   Before closing arguments, the district court reminded the jury, "it is your duty and your responsibility in this trial to find the facts.   You may find those facts only from the evidence which has been presented during the trial."   J.A. 385.

In closing, the United States argued "that the testimony trail, the physical evidence trail, and lastly, the digital footprint trail, all point to the same man, Luis Pineda."   J.A. 392.   The United States discussed

22

the elements of kidnapping, and it explained that the second element required a showing that the "victim was held or kidnapped for some purpose or benefit." J.A. 393. "[T]he government's evidence has shown," argued the United States, that "the defendant, even after they broke up, was obsessed with Flor Mejia." J.A. 393. "You may recall the photos from the defendant's phone," said the United States without objection. J.A. 393. "There's a tattoo on or about May 19," the United States continued, "which is two days before this kidnapping occurred, a fresh tattoo on the defendant's arm." J.A. 393. "You see the two initials," said the United States. J.A. 393. Before the United States completed another phrase — it got as far as, "You see F–" — defense counsel objected. J.A. 393. "[N]ot in evidence," said defense counsel. J.A. 393.

The court overruled defense counsel's objection, and the United States continued its argument. "You see the photograph," said the United States, "There is an F and there's an L." J.A. 393. "It is the government's contention that the F is for Flor, the L is for Luis, the defendant." J.A. 393–94. "That is two days before he committed this

23

kidnapping." J.A. 394. The United States urged the jury to look at the timing of the photographs on the Samsung phone that was in the Ford Fusion. J.A. 397. And it noted that Pineda's phone contained a photograph of a case of "Modelo beer" and reminded the jury that it could see a pack of Modelo beer in the back seat of the Ford Fusion. J.A. 397. The United States discussed the remaining elements of kidnapping, the testimony of the witnesses, and the physical evidence. J.A. 396.

Pineda's closing argument was that the case against him "rests solely on the shoulders of one witness," Flor Mejia, and "she lied." J.A. 398–405. "What do we know about her?" asked Pineda. J.A. 398. "Well," continued Pineda, "we know she lies. She lied to you yesterday." J.A. 398.

Counsel discussed Mejia's testimony on cross examination and said, "she boldly took the stand in a federal courthouse and lied to you." J.A. 399. "So we know this about her," counsel continued, "[s]he'll lie fluently, conveniently, boldly." J.A. 399. He argued that the physical evidence and crime-scene photographs did not corroborate Mejia's

testimony and contended that police officers did "very close to nothing."

J.A. 401–05.    Defense counsel repeatedly returned to the same theme,

arguing that Mejia is "not believable" and is "good at conveniently lying,

even in federal court."    J.A. 400–02.

In its rebuttal argument, the United States responded directly to

Pineda's theme.    J.A. 408.    "He's not arguing that someone else did it.

He's not arguing that they were together, but she's confused about

what's going on."    J.A. 408.    "He is telling you, or he wants you to

believe that she just flat out made this up."    J.A. 408.    The United

States argued that Pineda's plan failed because he did not expect Mejia

to tell her story to the two Americans she encountered, to the police, to

the paramedics, or to the others she encountered "most of whom do not

speak her language."    J.A. 406–08.    He thought that Mejia would be

"weak" and "scared" and "would go away," argued the United States.

J.A. 408.    "But what did she do just yesterday?" argued the United

States.    J.A. 408.    "She sat on this witness stand.    She put her hand

on this Bible, and she told you the truth."    J.A. 408.    The United

States contrasted its argument with Pineda's: "They called her a liar," the United States reminded the jury.   J.A. 408.

The United States identified for the jury a number of factors supporting a finding that Mejia was credible, beginning with an argument that the way Mejia had explained the events demonstrated that she was telling the truth.   J.A. 408.   The United States argued that Mejia's omission of some details supported the inference that she was telling the truth.   J.A. 408.   "Did she forget to mention a bush?" said the United States, "Probably."   J.A. 408.   "Did she forget to tell all of those people on the side of the road about the masked man? Probably.   Did she forget a lot of things in the year?   Probably," said the United States.   J.A. 408.   "Because when you're telling the truth about something that happened a year ago you should have faded memory."   J.A. 408.   When you are on the side of the road trying to tell responders who speak another language what happened, the United States explained, "you're trying to tell them who did it."   J.A. 408. "You're not thinking about a bush or a masked man or whatever else the defense wants you to think makes her a liar."   J.A. 408.

26

The United States argued that the "911 call" and "body camera footage" supported Mejia's credibility.   J.A. 408–09.   It invited the jury to consider whether "the behaviors that she exhibited, the breathing, the heaving, if that is someone who is lying."   J.A. 409.

The United States argued that fabricating the events would have required extraordinary effort.   J.A. 409.   Mejia would have had to put herself in a position of being stranded in the middle of the street at the location with her keys locked in the car and no way to communicate. J.A. 409.   And she would have had to leave her son behind.   J.A. 409.

The United States argued that Mejia had no motive to "make it up."   J.A. 409.   She had no reason "to do all that to herself and to her son."   J.A. 409.

"[T]he defense needs you to disbelieve" so much, the United States argued, "because if you believe her, then you know that this kidnapping happened."   J.A. 410.   "The word 'verdict' means to speak the truth," said the United States.   J.A. 410.   "And when you go and you deliberate you are going to be asked to render a verdict in this case, and your verdict must be based on the truth."   J.A. 410.   "[T]he truth is

27

that Luis Pineda kidnapped Flor Mejia on May 21, 2019," said the
United States.   J.A. 410.   "And we are asking that you find him guilty
as charged."   J.A. 410.

Pineda did not object to any part of the United States' rebuttal
argument.   J.A. 405–410.   The court's final instructions again drew a
distinction between "the evidence" and "the arguments, the contentions
and positions urged by the attorneys."   J.A. 416–417.   And the court
instructed the jury without objection that the jury's "duty" was "to
determine the truth of this matter."   J.A. 417.

Little more than an hour and a half after it began deliberating,
the jury asked two questions.   J.A. 421.   "Could the kidnapping have
occurred at any time during the night?" asked the first question.   J.A.
421.   "In other words, even if the victim initially went with the
defendant but later was prevented from leaving, is that still
kidnapping?"   J.A. 421.   The second question asked, "Is there a length
of time that a person needs to be held against their will to qualify as
kidnapping?"   J.A. 421.   The Court answered, "if you find beyond a
reasonable doubt that at some point in the encounter the alleged victim

was held against her will for an appreciable time, and you find beyond a reasonable doubt that the other elements of kidnapping have been met you may find the defendant guilty of the crime charged."   J.A. 424.

Two hours and twenty-five minutes after it began deliberating, the jury unanimously found Pineda guilty of kidnapping.   J.A. 425–28, 430.   The court thanked the attorneys for "professional representation" of their clients.   J.A. 428.

Two weeks after the jury verdict, Pineda unsuccessfully moved for a new trial, complaining about a number of issues, including the United States' closing argument.   J.A. 435.   The motion argued that the United States in its initial closing argument "commented on the meaning of" what the motion said were "Mr. Pineda's tattoos."   J.A. 436.   In support of a separate argument, Pineda acknowledged that "the prosecution" had "introduced" one "of Mr. Pineda's tattoos that supposedly is of Santa Muerte."   J.A. 442.   The motion also alleged error in the rebuttal argument, but not because of the comments he challenges on appeal.   J.A. 435.   The motion instead criticized the United States for arguing that Pineda had "a plan."   J.A. 435–38.   The

29

motion said nothing about the prosecutor's discussion of "the truth."
J.A. 435–38.

The district court denied the court's motion for a new trial.   J.A.
485.   The court sentenced Pineda to a term of imprisonment of 240
months.   J.A. 547.

## SUMMARY OF THE ARGUMENT

The United States did not engage in prosecutorial misconduct
during its initial closing argument by asking the jury to draw the
inference that the photographs introduced into evidence depicted fresh
tattoos on Pineda's arm of the initials "F" and "L."   The images were
found on the phone recovered from Pineda's seat.   The phone contained
images of Pineda's face.   The timestamped images reflect a series of
tattoos-in-progress followed by completed tattoos.   The jury heard
testimony that Pineda had a tattoo of Santa Muerte on his leg.   And
the jury saw the tattoo images themselves, which depict the letters "F"
and "L" and their freshness.   The prosecutor acted well within the
broad latitude the law afforded him as an advocate to ask the jury to
infer from this evidence that the images depicted Pineda's fresh tattoos

30

of those initials.   The argument, moreover, neither prejudiced Pineda nor denied him a fair trial.   The evidence, including Mejia's well-corroborated testimony, was strong.   And if Mejia had discredited herself as Pineda suggests, the argument about tattoos would not likely have rehabilitated her.

Nor did the United States engage in prosecutorial misconduct during rebuttal by arguing that Mejia told the truth.   The prosecutor did not improperly vouch for Mejia's credibility by offering any explicit personal assurance of her veracity or indicating that information not presented to the jury supports the testimony.   The prosecutor instead appropriately responded to the defendant's argument that Mejia "lied," would "lie fluently, conveniently, boldly," and was "good at conveniently lying."   J.A. 398–400.   And the prosecutor's argument made clear that what demonstrated Mejia's truthfulness was evidence properly before the jury.   Pineda cannot, in any event, establish prejudice denying him a fair trial, let alone plain error.   The evidence was strong and the prosecutor's argument that Mejia told the truth was not likely to have affected the appropriately instructed jury's assessment of it.   And even

31

if the prosecutor's comments were improper, they would not warrant reversal of Pineda's conviction, because Pineda's own argument invited them.

## ARGUMENT

**The United States' closing argument was proper.**

### A.    Standard of Review

This Court reviews "a trial court's rulings on objections to closing arguments for abuse of discretion." *United States v. Saint Louis*, 889 F.3d 145, 156–57 (4th Cir. 2018).   As Pineda explained in his new-trial motion, Pineda objected not to the argument that what the jury saw were "Mr. Pineda's tattoos" but instead the United States' comment on the "meaning of" those tattoos.   J.A. 393, 436.   The objection followed the United States' statement, "You see the two initials."   J.A. 393. And the district court understood Pineda's objection as an objection "to the reference to a 'fresh tattoo.'"   J.A. 485.   The district court's decision overruling this objection is therefore subject to the abuse-of-discretion standard of review.   *Saint Louis*, 889 F.3d at 156–57.

The arguments Pineda presents for the first time on appeal are subject to the plain-error standard of review.   J.A. 78.   Pineda was obligated to "object" to the statements he challenges on appeal "at the time they were made."   *United States v. Adam*, 70 F.3d 776, 780 (4th Cir. 1995); Fed. R. Crim. P. 51(b).   Pineda failed to preserve his argument about comments indicating the "Samsung phone was Pineda's," *Br. of Appellant* 27; he did not object when the United States told the jury, "You may recall the photos from the defendant's phone." J.A. 393.   He also failed to preserve his challenge to the argument that a tattoo was "on the defendant's arm."   J.A. 393.   He did not object to that argument during trial, J.A. 393, and when discussing his lone closing-argument objection in his post-trial brief, he told the court that the tattoos about which the "prosecutor commented" were indeed "Mr. Pineda's tattoos."   J.A. 436, *see also* J.A. 442.   Pineda appropriately concedes that he did not preserve his challenge to the United States' references to the truth during its rebuttal argument.   *Br. of Appellant* 33.   These arguments are subject to the plain-error standard of review. *Adam*, 70 F.3d at 780.

33

To prevail on any of his unpreserved arguments, Pineda must prove that "(1) there is in fact an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Davis*, 855 F.3d 587, 595 (4th Cir. 2017); *Adam*, 70 F.3d at 780.

## B.    Discussion

"Prosecutors enjoy considerable latitude in presenting arguments to a jury," this Court has explained. *Bates v. Lee*, 308 F.3d 411, 420–421 (4th Cir. 2002). "Although a prosecutor may not strike 'foul' blows, he 'may strike hard blows' and 'may prosecute with earnestness and vigor — indeed, he should do so.'" *United States v. Tzeuton*, 370 F. App'x 415, 420–21 (4th Cir. 2010) (unpublished decision) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). "Committed advocates" on both sides — prosecutors and defense attorneys alike — are not expected to "present antiseptic closing statements." *Bates*, 308

34

F.3d at 422. "[T]he jury is entrusted within reason" to resolve "heated clashes of competing views." *Id.*

To prevail on a theory that the United States engaged in prosecutorial misconduct during a closing argument, Pineda must establish two elements. *United States v. Benson*, 957 F.3d 218, 234 (4th Cir. 2020). First, "the defendant must show" that "the prosecutor's remarks or conduct were improper." *Id.* Second, "the defendant must" also "show" that the "remarks or conduct prejudicially affected his substantial rights so as to deprive him of a fair trial." *Benson*, 957 F.3d at 234.

The Court considers the "context" of challenged statements when determining whether an attorney has exceeded the "great latitude" the law affords him or her. *United States v. Ollivierre*, 378 F.3d 412, 418–21 (4th Cir. 2004), *sentence vacated on other grounds*, *Olliverre v. United States*, 543 U.S. 1112 (2005); *United States v. Lighty*, 616 F.3d 321, 360–61 (4th Cir. 2020). And "[i]n evaluating the question of prejudice," this Court has "noted that a number of factors are relevant, namely: (1) the degree to which the prosecutor's remarks had a

35

tendency to mislead the jury and to prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the defendant; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury." *United States v. Scheetz*, 293 F.3d 175, 185–86 (4th Cir. 2002).

And to prevail on his unpreserved arguments, Pineda must do more than establish the elements of prosecutorial misconduct.  *Adam*, 70 F.3d at 780.   He must also establish the remaining elements of the plain-error standard.  *Id.*

The prosecutors representing the United States acted firmly within the considerable latitude the law affords them as advocates.  *Id.* Counsel's discussion of the tattoos the jury saw extended no further than the evidence admitted by the court and inferences that can reasonably be drawn from it.   And when counsel argued that Mejia told the truth during rebuttal argument, while discussing the evidence

supporting that conclusion and in response to the defense argument to the contrary, counsel did not impermissibly vouch for Mejia's credibility.

### 1.   The United States did not engage in misconduct when it argued about Pineda's tattoos.

During its initial closing argument, the United States discussed what Pineda in his post-trial brief agreed were "Mr. Pineda's tattoos." J.A. 436, 442.   "You may recall the photos from the defendant's phone," the United States said without objection.   J.A. 393.   "There's a tattoo on or about May 19, which is two days before this kidnapping occurred, a fresh tattoo on the defendant's arm."   J.A. 393.   "You see the photograph, there is an F and there's an L," the United States continued after Pineda's objection to the discussion of "initials" was overruled.   J.A. 393.   "It is the government's contention," said the United States, "that the F is for Flor, the L is for Luis, the defendant. That is two days before he committed this kidnapping."   J.A. 394.

Pineda cannot establish either element of prosecutorial misconduct.   Nor can he establish that any of his unpreserved arguments about the United States' initial closing argument satisfy the plain-error standard of review.

37

### a.   Pineda cannot establish that the United States made improper remarks during its initial closing argument.

Pineda cannot establish that any of the prosecutor's remarks related to tattoos was "improper." *Benson*, 957 F.3d at 234. "[C]losing argument is not merely a time for recitation of uncontroverted facts." *United States v. Francisco*, 35 F.3d 116, 120 (4th Cir. 1994). A prosecutor's argument remains firmly within established bounds when it refers to admitted evidence *or* when it includes "reasonable inferences from the evidence." *Id.* The four remarks Pineda challenges, *see Br. of Appellant* 24, 27–28, were confined to admitted evidence and the inferences that evidence could reasonably permit.

First, the evidence supports more than a fair inference that the "Samsung phone belonged to Pineda." *Cf. Br. of Appellant* 27. The jury heard that the phone was recovered from the "driver's seat" of the Fusion shortly after Pineda drove it and left it locked until police opened it. J.A. 169–70, 231, 240, 161. And the jury, which saw Pineda in court, saw that the phone contained an image of "the defendant himself." J.A 490, 566, 596 (Gov't Ex. 17I, 17J). The evidence fully supports an inference that Pineda was the one who left

38

the phone containing his picture on the driver's seat where he sat.   The

United States' suggestion that the jury "recall the photos from the

defendant's phone," made without objection, was entirely appropriate.

J.A. 393.

Pineda's new-trial motion notably did not regard as unfair the

inference from the evidence that the phone was Pineda's.   To the

contrary, Pineda asserted that the "[d]igital evidence" that was part of

"the government's case" included "Mr. Pineda's phone contents."   J.A.

433.

Second, the evidence supports the inference "that the tattooed

body parts shown in the photos were Pineda's."   *Cf. Br. of Appellant* 27.

The jury heard that the photos of tattoos were part of a series with time

and date stamps that followed one another and included a photograph

of Pineda's face.   J.A 347–356, 490, 596 (Gov't Ex. 17).   The

timestamped photographs follow a pattern — photographs in the early

evening of tattoos in progress, followed by completed tattoos between 10

and 11 p.m. the same evening.   J.A. 359–60, 596 (Gov't Ex. 17E, 17H).

And one of the tattoos, seen by the jury both in-progress with a 6:43-

39

p.m. timestamp and completed with a timestamp between 10 and 11 p.m., depicts a leg with a tattoo like what another photograph captions "San La Muerte."    J.A. 359–60, 490, 596 (Gov't Ex. 17A, 17B, 17F). The jury heard direct testimony that Pineda had a tattoo of "Santa Muerte" on his leg.    J.A. 374–375.    This evidence, recovered from the phone Pineda had left on the driver's seat when he dragged Mejia out of the car, supports the argument that the series of images depicted Pineda's tattoos.    *Cf. Br. of Appellant* 393–94.

Pineda's new-trial brief, prepared with the benefit of weeks of hindsight, again indicates that Pineda and his trial team did not view the inference that the tattoos were his as an unfair one.    Pineda agreed that the tattoos that the "prosecutor commented on" during "closing argument" were "Mr. Pineda's tattoos."    J.A. 436.    And he declined to argue that this inference was improper.    J.A. 436.    In support of another new-trial argument that he does not repeat on appeal, moreover, he affirmatively agreed that "the prosecution *introduced*" at least "one of Mr. Pineda's tattoos."    J.A. 442 (emphasis added). Neither Pineda nor the jury, of course, was required to agree with the

40

inference the United States argued.   But the United States did not engage in misconduct by *asking* the jury to draw that reasonable inference.

Third, the evidence amply supports the inference that "the tattoos depicted Pineda's and Mejia's initials."   J.A. 28.   Mejia testified that Pineda's name is "**L**uis."   J.A. 174 (emphasis added).   And she testified that her name is "**F**lora."   J.A. 149 (emphasis added).   Two of the images admitted into evidence depict the corresponding initials "F" and "L":



J.A. 359–60, 596 (Gov't Ex. 17E, 17H) (emphasis in blue added).

Finally, the evidence fully supported the argument that the images depict "a fresh tattoo." J.A. 393. The jury heard testimony that the arm-tattoo images bore timestamps between 10 and 11 p.m. on May 19, 2019 — like the timestamps of images of other freshly applied tattoos that were accompanied by photographs, timestamped earlier the

42

same day, showing their application to a leg and wrist, respectively. J.A. 359–60, 596 (Gov't Ex. 17B–17J). That evidence alone supports the inference that the images of the arm tattoo, like the comparably timed images of the wrist and leg tattoo, depict tattoos that had been freshly applied earlier that day. The jury could also see that the letters "L" and "F" in the photograph appear more bold than other parts of the tattoo, the letters are surrounded by skin redness, and they are consistent with the appearance of the recently applied wrist tattoo:



J.A. 359–60, 596 (Gov't Ex. 17H, 17G). The jury did not need the help

of an "expert" or any additional witness. *Cf. Br. of Appellant* 28. The

United States acted within its broad latitude during closing arguments

when it described the tattoo in the photograph as "fresh."

Pineda argues for a different interpretation of this tattoo evidence

— he argues, for example, that someone else might have owned the

44

phone Pineda left on the driver's seat because the car was registered to

someone else, *Br. of Appellant* 27 — but these arguments miss the

mark.   The question is not whether this Court agrees with the

inferences argued by the United States or even whether the jury ought

to have agreed with them.   *Bates*, 308 F.3d at 422.   The question

before the court is whether the arguments made by the United States

*can* "be reasonably drawn from the facts in evidence."   *United States v.*

*Wilson*, 135 F.3d 291, 298 (4th Cir. 1998).   The arguments presented by

the United States well meet this requirement.

The decisions on which Pineda relies, *see Br. of Appellant* 25–29,

illustrate the wide gulf between the closing argument in his case and

the kinds of arguments that have been held out of bounds.   The

prosecutor in *Wilson*, for example, asked the jury to make the leap from

evidence that the defendant had shot into a car that maneuvered "like it

had been hit" to a conclusion that the defendant had murdered the

driver.   135 F.3d at 298.   This Court held that "there was no basis

from direct fact or reasonable inference" for that argument, noting that

45

"there was no evidence" before the jury "that the driver had died." *Id.* at 298.

The Sixth Circuit in *United States v. Hamm* held that the United States "stated facts not in evidence" when it argued that fentanyl, heroin, and carfentanil "came from" the defendants or were "from" particular undercover transactions. 952 F.3d 728, 741 (6th Cir. 2020). The statement was improper because United States did not introduce "any evidence" connecting the drugs to the defendant or the transactions. *Id.*

*United States v. Brown* involved a prosecutor who argued that a "particular firearm" was "incapable of retaining identifiable fingerprints," without any testimony to that effect. 765 F.3d 278, 296–97. The court held that the argument went beyond the "common sense" understanding it could reasonably expect jurors to possess. *Id.*

The First Circuit's decision in *United States v. Kuljko*, 1 F.4th 87, 94 (1st Cir. 2021), is similar to *Brown*. The Court held that a prosecutor who said "phone records don't identify three-way phone

46

calls" — again without any testimony to that effect — "stat[ed] a fact not in evidence." 1 F.4th 87, 94 (1st Cir. 2021).

Each of the decisions on which Pineda relies involves a closing statement that even an inference from the evidence would not support. The district court in *Wilson* "had pointedly excluded any evidence of what happened to the driver." *Wilson*, 135 F.3d at 298. The jury heard nothing in *Hamm* suggesting where the tested drugs were "from." 952 F.3d 728. It heard nothing in *Brown* suggesting the gun was "incapable of retaining identifiable fingerprints," 765 F.3d at 296–97. It heard nothing in *Kuljko* that would enable it to determine whether "phone records" identify "three-way phone calls." 1 F.4th at 94.

The jury that found Pineda guilty, in contrast, heard and saw evidence that well more than suggested that Pineda had on his arm fresh tattoos of the letters "F" and "M." The jury saw the photos themselves, the letters they depict, Pineda's face among the photos, the timestamps. It heard that they were recovered from Pineda's seat. And it heard Aguilar's testimony about Pineda's leg tattoo. Pineda

47

does not challenge the district court's decision to *admit* any of this
evidence.

"[T]he adversary system" contemplates that advocates will present
"competing views" of the evidence to the jury, and even "heated clashes"
over that evidence do not establish *misconduct* by the attorneys.  *Bates*,
308 F.3d at 422.   The inferences the United States argued about the
tattoo images introduced into evidence were firmly within the bounds of
reasonable advocacy.   The prosecutor did not transgress "the guiding
principle" that a "prosecutor should not strike foul blows."  *United
States v. Webb*, 965 F.3d 262, 267 (4th Cir. 2020) (cleaned up).

### b.    Pineda cannot establish that the prosecutor's remarks prejudiced him or deprived him of a fair trial.

Even if Pineda could establish that the United States' arguments
about tattoos were improper, he would remain unable to establish that
they "prejudicially affected his substantial rights so as to deprive him of
a fair trial."  *Benson*, 957 F.3d at 234.   As mentioned, this Court
ordinarily considers six factors when addressing this issue.  *Scheetz*,
293 F.3d at 185.   Those factors demonstrate that Pineda's "substantial

48

rights" were not prejudiced, let alone "to the point of denying him a fair trial." *Lighty*, 616 F.3d at 361.

First, "the competent proof introduced to establish the guilt of the defendant" was strong "absent the remarks." *Scheetz*, 293 F.3d at 185. Entirely apart from the evidence about tattoos, Mejia testified that Pineda kidnapped her, used the kind of rope Pineda had used for work to tie her up, drove her to the woods, dragged her out of the car, and threatened to kill her before she escaped. J.A. 153–67.

Evidence other than the tattoo photographs corroborated Mejia's testimony that Pineda had kidnapped her. The jury heard from multiple witnesses describing how Mejia tried to communicate, the night of the kidnapping, that someone had stuffed something in her mouth and had strangled her, and they saw footage from Detective Crespi's body camera showing Mejia's efforts to communicate. J.A. 110–40, 205–210. The jury saw the muletape left in the woods that night, saw the spool of muletape in the car, and heard Aguilar's testimony that Pineda was familiar with that muletape. J.A. 122, 124–25, 138, 217–18, 223–24., 243, 372. They heard Mejia's son say that he

heard a scream outside the apartment.   J.A. 196–97.   And the jury saw the abrasions on Mejia's neck.   J.A. 123–24.   Simply put, even if the jury had not heard any comments about the digital evidence from the phones, the evidence establishing that Pineda had kidnapped Mejia would be remarkably strong.

The portions of the record Pineda cites for his claim that Mejia's testimony was "riddled with inconsistencies" and "questionable," *Br. of Appellant* 1, 3–7, 30, 38, do not show the case against Pineda to be weak.   The record does not support, for example, Mejia's suggestion that she answered defense counsel's questions untruthfully.   *Cf. Br. of Appellant* 4.   Mejia did not "deny[] that she had used an assumed name."   *Compare Br. of Appellant* 4 *with* J.A. 174–75.   To the contrary, Mejia acknowledged using the name "Estrella" for her "entire life" and that her employer knew her as "Estrella."   J.A. 175, 180.   She denied that her employer knew her as Estrella "Mauricia" or "Murcia," but nothing in the record indicates that her employer knew either of those last names.   J.A. 175.

50

Nor did Mejia ever "admit[] that she used a fake North Carolina ID." *Br. of Appellant* 4 (citing J.A. 174–75).   The defense showed her an identification document that Mejia candidly agreed was hers.   J.A. 175.   But, in addition to the lack of evidence that the document had anything to do with "North Carolina," neither the defense nor anyone else presented evidence that the document was "fake," or that she had ever "used" it for any purpose, *Br. of Appellant* 4, 38.   J.A. 175.   Even if the jury were convinced that Mejia had used a "fake identification" at a time when she "didn't have a passport," *Br. of Appellant* 4, 38 (bracket omitted), moreover, it is highly unlikely that the jury would have inferred that she had fabricated sworn testimony that her ex-boyfriend had kidnapped her, along with the accompanying injuries.

The pages of criticism of Mejia's testimony in Pineda's appellate brief identify very little that the jury is likely to regard as discrediting, *Br. of Appellant* 2–15.   He criticizes Mejia for not "explaining how she could have called her son if her hands were tied," for example, *Br. of Appellant* 5–6, citing her testimony that she had called him "[w]hen [she] left [her] house," J.A 172.   Mejia, however, testified that she left

51

her home voluntarily to retrieve her purse, well before she was
restrained.    J.A. 152.    And she did not say that she used "her hands"
to call her son, *Br. of Appellant* 5–6, or anything other than her voice.
Pineda also criticizes her, in another example, for failing to explain
"how Pineda could have tripped" when he fell, *Br. of Appellant* 7.    But,
although she acknowledged that she did not "know how it was that he
fell down," Pineda had been using rope, and she explained that she
believed that he "got tied up with something," J.A. 166–67.    Other
examples of Mejia's testimony that Pineda criticizes are in the same
vein.    *See Br. of Appellant* 2–15.

The jury is not likely to have viewed the testimony Pineda
describes as discrediting, particularly in the light of the physical
evidence and statements of others corroborating Mejia's testimony that
Pineda had tied her up.    And if the jury had agreed that "Flor Mejia's
story" did not "add up," *Br. of Appellant* 3, the United States' argument
about tattoos would not likely have rehabilitated her credibility.

Second, "the degree to which the prosecutor's remarks had a
tendency to mislead the jury and to prejudice the defendant," *Scheetz,*

52

293 F.3d 175, 185–86, was minimal.    The evidence about the tattoos

was properly before the jury.    And, as the district court noted when

rejecting Pineda's new-trial motion, the prosecutor made clear that he

was asking the jury to draw inferences.    J.A. 485.    If the inferences

were unreasonable, "it is likely the jury" would have "simply

disregarded" them.    *Lighty*, 616 F.3d at 362.

Pineda remained in a position to present his "competing views."

*Bates*, 308 F.3d at 422.    He was aware the "digital evidence" had been

admitted, J.A. 349, and he knew that the tattoos were "Mr. Pineda's

tattoos," J.A. 436.    He was not unfairly surprised or faced with an

argument he was unprepared to address.    *Compare Wilson*, 135 F.3d at

302 (reversing because of an improper "murder accusation" during

closing argument that "came as a last-minute surprise after it was too

late for" the defendant "to develop and offer a factual defense, a defense

that appeared to be available.").    "It is also highly unlikely that the

jury was misled because the district court instructed the jury that the

arguments of counsel were not evidence," *Lighty*, 616 F.3d at 362.    J.A.

96.

Third, the challenged inferences that the United States asked the jury to draw were more "isolated" than "extensive" in the context of the trial and the closing argument. *Scheetz*, 293 F.3d at 185–86. The comments Pineda contends were "improper," *Br. of Appellant* 23–29, appear on little more than one half of one page of the transcript, J.A. 393–94; *Lighty*, 616 F.3d at 362 (holding "a few lines" of an argument to be "isolated"). Pineda is correct that the United States referred elsewhere in the argument to a "digital footprint," *Br. of Appellant* 30, but the "digital evidence" itself was properly before the jury, J.A. 349, and the prosecutor was entitled to discuss it. *Francisco*, 35 F.3d at 120. The inferences the United States asked the jury to draw from the properly admitted evidence were not a "significant diversion" from evidence properly before the jury. *Wilson*, 135 F.3d at 299, 302.

Fourth, the record makes clear that the prosecutor's "comments" were not "deliberately placed before the jury to divert attention to extraneous matters." *Scheetz*, 293 F.3d 175, 185–86. The United States explicitly based its argument about Pineda's tattoos on evidence admitted by the district court. J.A. 393–94. And the prosecutor acted

54

with the approval of the district court, which overruled defense counsel's objection.    J.A. 393–94.    The record makes clear that the prosecutor acted in good faith.    Pineda's accusation that the prosecutor acted with an improper "two-fold purpose," *Br. of Appellant* 31 (citing nothing), is "rank speculation," *Lighty*, 616 F.3d at 362.

Fifth, the consideration "whether the prosecutor's remarks were invited by improper conduct of defense counsel" is inapplicable, as Pineda appears to recognize.    *Br. of Appellant* 31.    The challenged comments about tattoos preceded the defense argument.    *See Lighty*, 616 F.3d at 362.

Finally, although Pineda did not request, and the district court did not give, a "curative instruction[]" in the middle of closing arguments, *Scheetz*, 293 F.3d at 185–86, the court did instruct the jury that "statements, arguments and questions by lawyers" are "not evidence," J.A. 96.    "[J]uries are presumed to follow their instructions." *United States v. Chong Lam*, 677 F.3d 190, 204 (4th Cir. 2012) (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (4th Cir. 2012)).    The court's

55

instructions ensured that Pineda's "case" was decided "based solely on the evidence presented."   J.A. 95, 98.

Pineda does not "advance" any "credible arguments to rebut the presumption that the jury followed its instructions."   *Chong Lam*, 677 F.3d at 204.   Instead, he asserts that "the court *never* instructed the jury that statements and arguments of counsel are not evidence in the case." *Br. of Appellant* 32 (emphasis added).   Pineda's assertion is not accurate.   J.A. 96.   "Given that [Pineda] has presented no credible arguments to rebut the presumption that the jury followed" its instructions, "there is no cognizable error in the government's closing argument."   *Benson*, 957 F.3d at 236.

### c.   Pineda cannot establish that the comments to which he failed to object satisfy the elements of the plain-error standard.

Pineda also cannot meet the requirements of the plain-error standard for the arguments to which he did not object.   An error is plain only if "(1) the explicit language of a statute or rule resolves the question or (2) at the time of appellate consideration, the settled law of the Supreme Court or this Court establishes that an error has

56

occurred." *Davis*, 855 F.3d at 595–96. Pineda has not identified any relevant statutory language, and the Fourth Circuit precedent he relies on, such as the decision holding that it was reversible error for the court to allow the prosecutor to *surprise defense counsel* with an argument that the defendant had *murdered someone* without evidence that the person had died, *Wilson*, 135 F.3d at 298, settles nothing in favor of Pineda in this appeal. Pineda identifies no authority from any court establishing prosecutorial misconduct in the United States' closing argument.

Even a "plainly improper statement is not enough to merit reversal on plain-error review." *Webb*, 965 F.3d at 268; *Adam*, 70 F.3d at 780. Pineda cannot establish that any of the prosecutor's comments affected his substantial rights because, as explained above, he cannot establish the second element of prosecutorial misconduct. *Id.* Nor can he show that allowing him to raise the errors he alleges for the first time in this appeal would be necessary to protect the "fairness, integrity, or public reputation of judicial proceedings." *Davis*, 855 F.3d at 595; *Adam*, 70 F.3d at 780.

### 2. The prosecutor did not engage in misconduct by discussing the truth during rebuttal.

After defense counsel argued that the United States' case rested exclusively on Mejia's credibility and that she "lied" on the witness stand, J.A. 398–405, the United States responded in its rebuttal closing argument, J.A. 405–10.   "She sat on this witness stand," argued the United States after describing Mejia's testimony.   J.A. 406–08.   "She put her hand on this Bible," continued the United States, "and she told you the truth."    J.A. 408.

The United States contrasted its argument with Pineda's, reminding the jury, "They called her a liar."   J.A. 408.   And the United States identified six factors that it contended warranted the jury in finding Mejia credible: (1) the human imperfection of her memory, (2) the "911 call," (3) the "body camera footage," (4) the "behaviors that she exhibited," (5) the difficulty Mejia would have faced fabricating the events, and (6) her lack of motive to fabricate her testimony.   J.A. 408–410.

The prosecutor explained how the testimony the jury heard "demonstrated her truthfulness."   *Br. of Appellant* 35; J.A. 408–410.

And it closed by arguing that that the "word 'verdict' means to speak the truth, reminding the jury that its "verdict must be based on the truth," and arguing that "the truth is that Luis Pineda kidnapped Flor Mejia on May 21, 2019."   J.A. 410.

The United States acted firmly within the "great latitude" the law accords advocates when it met Pineda's argument that Mejia was "lying" by arguing that Mejia was instead telling the truth and identifying the evidence that it contended established Mejia's truthfulness, J.A. 400.   *Ollivierre*, 378 F.3d at 418–21.   Pineda cannot establish that the prosecutor's comments were "improper."   *Benson*, 957 F.3d at 234.   He cannot establish that the prosecutor's remarks "prejudicially affected his substantial rights so as to deprive him of a fair trial."   *Id.*   And he cannot establish a plain error warranting reversal of his conviction.

### a.   The United States did not improperly vouch for Mejia's credibility by referring to the truth during its rebuttal argument.

The United States did not "vouch for Mejia's credibility" when it argued that Mejia was telling the truth in its rebuttal closing argument.

59

*Cf. Br. of Appellant* 32.   "Vouching occurs when the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a *personal belief* in the credibility of the witness." *Lighty*, 616 F.3d at 359 (emphasis added) (quoting *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1984)).   A prosecutor's expression of "his personal opinion" can "pose two dangers." *United States v. Young*, 470 U.S. 1, 18 (1985).   The "comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant." *Id.*   And the prosecutor's "opinion" carries with it "the imprimatur of the Government and may induce the jury to trust the Governments' judgment rather than its own view of the evidence." *Id.*   A prosecutor, therefore, may not "make explicit personal assurances that a witness is trustworthy or implicitly bolster the witness by indicating that information not presented to the jury supports the testimony." *Lighty*, 616 F.3d at 359.

The prosecutor did not vouch for Mejia's credibility when arguing that Mejia told "the truth," J.A. 408, because the prosecutor did not express a "*personal* belief in the credibility of the witness." *Lighty*, 616

60

F.3d at 359 (emphasis added).    Two features of the prosecutor's

argument make its propriety clear.

First, the prosecutor's "statement[s]" were "an appropriate

response to defense counsel's attacks against" Mejia's "credibility."

*United States v. Campbell*, 347 F. App'x 923, 930 (4th Cir. 2009)

(unpublished decision); *Ollivierre*, 378 F.3d at 423; *United States v.*

*Wilkes*, 662 F.3d 524, 540 (9th Cir. 2011).    The context of the comments

conveyed to the jury that they were a direct response to Mejia's

argument, not an "explicit personal assurance[]" or an indication "that

information not presented to the jury supports the testimony."   *Lighty*,

616 F.3d at 359.

Arguments that Mejia lied and arguments that Mejia told the

truth are "competing views" on the same matter.   *Bates*, 308 F.3d at

422.    Pineda asserts that his own attorney's comments on Mejia's

credibility were "proper[]."   *Br. of Appellant* 39.    The United States'

comments were no less so.   *United States v. Robinson*, 485 U.S. 25, 33

(1988) ("[I]t is important that both the defendant and the prosecutor

61

have the opportunity to meet fairly the evidence and arguments of one
another.").

This Court has addressed the scenario where the defense argues
"that the government's key witness was a liar and the prosecutor
responded by arguing that the witness was truthful." *Ollivierre*, 378
F.3d at 423. It held that a prosecutor's argument during rebuttal that
defense counsel "tried to shake" a witness and "he couldn't because she
told the truth" was "permissibly responsive to accusations that" the
witness "had lied." *Id.* Such a response is not "impermissible
vouch[ing]." *Id.* The argument of the prosecutor who addressed
Pineda's jury likewise was not impermissible vouching.

Second, the prosecutor's statements, which were followed
promptly by a detailed discussion of six factors the United States
contended demonstrated Mejia's credibility, made clear that counsel
was "arguing that the jury should accept its interpretation of the
evidence rather than the defendant's interpretation." *United States v.
Finch*, 16 F.3d 228, 232 (8th Cir. 1994); *United States v. Hylor*, 353 F.
App'x 361, 363 (11th Cir. 2009) (unpublished decision). The

62

prosecutor's statement, J.A. 408, does not contain any "explicit personal assurances," *Lighty*, 616 F.3d at 359.   And the argument's close connection to the evidence supporting it makes clear that it was not based on "information not presented to the jury," *Lighty*, 616 F.3d at 359.   Pineda acknowledges that the prosecutor both said that Mejia told "the truth" and also told the jury what testimony "demonstrated her truthfulness."   *Br. of Appellant* 35.   The prosecutor's arguments were a "fair comment on the evidence," *United States v. Alexander*, 741 F.3d 866, 871 (7th Cir. 2014), and not "foul blows," *Webb*, 965 F.3d at 267.   *See United States v. Cottier*, 908 F.3d 1141, 1148 (8th Cir. 2018) (argument that witness "told the truth" did "not constitute improper witness vouching" when made to "explain why the jury might find" the witness "credible based on the evidence before the jury").

Pineda does not identify anything indicating the United States' comments were an expression of "personal belief" about Mejia's veracity instead of an appropriate argument that the jury ought to find her credible.   *Lighty*, 616 F.3d at 359.   He instead contends that a

63

"prosecutor's argument that a government witness told the truth" is always "impermissible." *Br. of Appellant* 34.

The bright-line rule on which Pineda relies equating an argument that a witness told the truth with impermissible vouching does not exist. An argument that a witness "is telling the truth" is "not impermissible vouching" if it does not "convey, either implicitly or explicitly, an expression of the prosecutor's or the government's opinion as to the witness's veracity." *United States v. Jones*, 471 F.3d 535, 544 (4th Cir. 2006); *Ollivierre*, 378 F.3d at 423; *Campbell*, 347 F. App'x at 930. The "prohibition against vouching does not" forbid "prosecutors from arguing credibility." *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009); *Jones*, 471 F.3d at 543–44; *United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir. 1997).

"Context is everything" when evaluating a "claim of improper vouching by a prosecutor who has argued in summation that a particular witness has told the truth." *United States v. Grigsby*, 338 F. App'x 514, 516 (6th Cir. 2009) (unpublished decision). As the decisions on which Pineda relies from the First and Ninth Circuits illustrate,

64

when an attorney speaks of the "truth" when "offering his *personal*

*belief*" about a witness's veracity, the statement can constitute improper

vouching. *United States v. Williams*, 112 F. App'x 581, 582 (9th Cir.

2004) (unpublished decision) (emphasis added); *United States v.*

*Rodriguez-Adorno*, 695 F.3d 32, 40 (1st Cir. 2012) (comment that

witness was "[o]f course" honest was "improper vouching" because it

was "unmistakably the personal opinion of the prosecutor");[1] *United*

*States v. Kerr*, 981 F.2d 1050, 1052 (9th Cir. 1992) (prosecutor who

"deliberately introduced into the case his personal opinion of the

witness's credibility" engaged in impermissible vouching).    But when

---

[1] Another First Circuit decision, *United States v. Wihbey*, did not
discuss in detail why it found that the prosecutor's comments indicating
that witnesses had testified truthfully met the definition of vouching, 75
F.3d 761, 772 (1st Cir. 1996).    And when evaluating whether the
statements were "harmful," it concluded that the prosecutor "did not
express his personal opinion about the witnesses' veracity" and did not
"suggest that he had special knowledge about the witness's credibility."
*Id.* at 772.    This decision does not help Pineda because, under Fourth
Circuit precedent, these conclusions would establish that the comments
do not meet the definition of vouching.    *Lighty*, 616 F.3d at 359.    The
decision also appears to be in tension with other First Circuit decisions
holding that a prosecutor's argument that a witness was telling "the
truth" does not constitute vouching if it does not convey what a
"prosecutor himself thinks."    *United States v. Vazquez-Larrauri*, 778
F.3d 276, 285 (1st Cir. 2015).

the context demonstrates that the prosecutor is "arguing that the *jury* should find" a witness "credible, not that the *prosecutor* knew him to be so," the prosecutor does not engage in impermissible vouching, even if he urges the jury to find that a witness is an "honest man telling you the truth." *United States v. Cordova*, 186 F. App'x 742, 744 (9th Cir. 2006) (unpublished decision); *Jones*, 471 F.3d at 543–44.

In the words of the First Circuit, an argument to a jury that a witness was "telling you the truth" is improper if it conveys "what the prosecutor himself thinks," but it is not improper if it conveys "a proposition for review." *United States v. Vazquez-Larrauri*, 778 F.3d 276, 285 (1st Cir. 2015). This Court and others have time and again recognized this distinction and held that a prosecutor did not engage in improper vouching when arguing that a witness told the truth.[2]

---

[2] *See, e.g.*, *Campbell*, 347 F. App'x at 930; *Jones*, 471 F.3d at 544; *Ollivierre*, 378 F.3d at 423; *United States v. Partida*, 842 F. App'x 63, 65 (9th Cir. 2021) (argument that "witnesses were telling the truth" made in response to defendant's arguments that "witnesses were lying" not "improper vouching"); *Wilkes*, 662 F.3d at 540 ("The prosecutor's argument that its witnesses told the truth, rather than Wilkes, was not vouching but was 'simply an inference from evidence in the record.'"); *Cottier*, 908 F.3d at 1148; *United States v. Phea*, 755 F.3d 255, 267–68 (5th Cir. 2014) (holding argument that witness was "likely telling the

66

The prosecutor's rebuttal argument was firmly within the broad latitude the law gives attorneys to "prosecute with earnestness and vigor," *Tzeuton*, 370 F. App'x at 420–21, and to "meet fairly" Pineda's argument that Mejia had lied, *Robinson*, 485 U.S. at 33.   Pineda has not established any improper conduct by the prosecutor.

> **b.    Pineda cannot establish that the United States' references to the truth prejudiced him or deprived him of a fair trial.**

Even if Pineda could establish that the United States' argument that Mejia told the truth amounted to improper vouching, he would remain unable to establish that the argument "prejudicially affected his substantial rights so as to deprive him of a fair trial."    *Benson*, 957

---

truth" "not improper"); *Alexander*, 741 F.3d at 871 (argument that witness did not tell a more elaborate story "because he told you the truth" was "fair comment on the evidence"); *United States v. Rivas*, 493 F.3d 131, 138 (3d Cir. 2007) (prosecutor did not "improperly vouch for its witnesses" when it argued that "they came here and they told you the truth about what happened"); *Hylor*, 353 F. App'x at 363 (statements of prosecutor who "submitted to the jury that" witness "was telling the truth, and that the evidence supported his testimony" were "not improper"); *Grigsby*, 338 F. App'x at 516 ("[T]he prosecutor's statement in closing argument that, 'I submit to you, [the witness] was truthful,' was not an unfair comment."); *Cordova*, 186 F. App'x at 744.

F.3d at 234.   The six factors this Court considers when evaluating this element establish that no prosecutorial misconduct occurred.

First, as explained above, *see Argument* § B.1.b, *supra*, "the competent proof introduced to establish the guilt of the defendant" was strong "absent the remarks," *Scheetz*, 293 F.3d at 185.   The evidence the jury heard and saw — the testimony of other witnesses, the body-camera footage, the rope, the photographs of the injuries on Mejia's neck — thoroughly corroborated Mejia's testimony.   The parts of Mejia's testimony that Pineda criticizes are not particularly discrediting.   And if Mejia's testimony, which was before the jury for it to evaluate, did not "add up," *Br. of Appellant* 3, the jury would not likely have viewed the prosecutor's argument that she was telling the truth as a credible argument.

Second, "the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the defendant," *Scheetz*, 293 F.3d 175, 185–86, was minimal.   The remarks focused on the topic Pineda had argued:   whether Mejia told "the truth," J.A. 408, or "lied" to the jury, J.A. 399.   *Compare Wilson*, 135 F.3d at 302.   They were

68

closely followed by a detailed summation of the evidence that was
properly before the jury.    J.A. 408–410.    And it is "highly unlikely that
the jury was misled because the district court instructed the jury that
the arguments of counsel were not evidence," *Lighty*, 616 F.3d at 362.
J.A. 96.

Third, the arguments that Mejia was telling the "truth," J.A. 408,
were more "isolated" than "extensive," *Scheetz*, 293 F.3d at 185–86.
*See* J.A. 408.    Nor can statements that Mejia was telling the truth be
considered a "significant diversion" from issues before the jury.
*Wilson*, 135 F.3d at 299, 302.    Pineda concedes that whether Mejia was
telling the truth was central to the case.

Fourth, the record makes clear that the prosecutor's "comments"
were not "deliberately placed before the jury to divert attention to
extraneous matters."    *Scheetz*, 293 F.3d 175, 185–86.    To the contrary,
the prosecutor's comments focused on the precise issue raised by the
defense's closing argument:    whether Mejia had lied or told the truth.
Pineda's accusation that the prosecutor acted in bad faith by making a
"deliberate choice" to emphasize "her opinion," *Br. of Appellant* 39

69

(citing nothing), is both "rank speculation," *Lighty*, 616 F.3d at 362, and

objectively baseless.    The prosecutor did not say, let alone "emphasize,"

that her statement to the jury was "her opinion," *Br. of Appellant* 39.

*Compare Young*, 470 U.S. at 5 (addressing a comment by counsel

stating his "personal impressions").    The host of decisions from this

Court and other circuits holding that a prosecutor may argue that a

witness told the truth without stating her personal opinion, *see n.* 2,

*supra*, establishes that the prosecutor acted in good faith.

Fifth, the consideration "whether the prosecutor's remarks were

invited by improper conduct of defense counsel," *Scheetz*, 293 F.3d 175,

185–86, would be highly relevant if this Court were to conclude that the

prosecutor's comments were improper.    If this court were to conclude

that it was improper for the United States to argue that Mejia told "the

truth," J.A. 408, both fairness and the law would require this Court to

conclude that it was equally improper for defense counsel to argue that

Mejia "lied," J.A. 399.    "With the exception of the rule prohibiting a

prosecutor from commenting on a defendant's failure to testify," the

rules governing prosecutors during closing argument apply also to

70

defense counsel.   *Olliverre*, 378 F.3d at 419 n.3; *Young*, 470 U.S. at 8–

9.[3]   "Defense counsel, like the prosecutor, must refrain from

interjecting personal beliefs into the presentation of his case."   *Young*,

470 U.S. at 9.

Pineda acknowledges that a statement that a witness "told the

truth" and a statement that a witness "lied" are equal; he contends they

are both "statements[s] of personal belief."   *See Br. of Appellant* 34.

And he acknowledges, as he must, that his attorney argued that Mejia

lied.   *Br. of Appellant* 16.   But he contends that his own attorney's

argument was not "improper," *Br. of Appellant* 34–39, apparently

because the bright-line rule he proposes applies only to "a prosecutor's

statement," and not to his own attorney's conduct.   *Br. of Appellant* 34,

39.   Precedent forecloses Pineda's one-sided proposal.   The rule

against expressing personal beliefs is "equally applicable to defense

attorneys."   *Olliverre*, 378 F.3d at 419 n.3; *Young*, 470 U.S. at 8–9.   If

---

[3]   Appellate court decisions about closing argument overwhelmingly
involve the comments of prosecutors because defense counsel's tactics
during closing argument, proper or improper, will rarely be appealable.
*See Young*, 470 U.S. at 9 n.6.

71

this Court were to accept Pineda's argument that the prosecutor's comments were wrongful, then Pineda's attorney's comments would also be wrongful.

The United States' rebuttal argument was a direct and equal response to the defense attorney's vigorous closing argument that Mejia lied.   J.A. 398–405.   Precedent establishes that both sides *appropriately* presented "competing views" of Mejia's credibility, which the law trusts "the jury" to resolve.   *Bates*, 308 F.3d at 422; *Argument* § B.2.a, *supra*.   If this Court were to disagree, however, and conclude that the United States stepped out of bounds, the conduct of the prosecutor would remain improper regardless of the defense attorney's equally wrongful conduct.   "[T]wo improper arguments — two apparent wrongs — do not make for a right result."   *Young*, 470 U.S. at 11.   But that conclusion would also mean that the United States' remarks were "invited by improper conduct of defense counsel."   *Scheetz*, 293 F.3d 175, 185–86.   And a prosecutor's improper remarks do "not warrant reversing a conviction" if they respond substantially to "defense counsel's opening salvo."   *Young*, 470 U.S. at 12–13.

Finally, although the court did not give a "curative instruction[]" in the middle of the rebuttal to which Pineda did not object, *Scheetz*, 293 F.3d at 185–86, this Court presumes that the jury followed the court's instruction that "statements, arguments and questions by lawyers" are "not evidence," J.A. 96; *Chong Lam*, 677 F.3d at 204. Pineda does not present any "arguments to rebut the presumption," *id.*; he instead repeats his earlier assertion that the court did not "instruct the jury that statements and arguments of counsel are not evidence in the case." *Br. of Appellant* 39. The record refutes his assertion, J.A. 96, and Pineda's failure to rebut the presumption precludes him from establishing "cognizable error in the government's closing argument." *Benson*, 957 F.3d at 236.

Although the presumption that juries follow their instructions requires no corroboration, the jury's questions to the court during deliberation confirm that it followed them. J.A. 421–24. The jury asked if conduct was "still kidnapping" if "the victim initially went with the defendant." J.A. 421. Mejia's testimony indicates that she did not go with Pineda voluntarily. J.A. 153–61. The jury's question,

73

therefore, demonstrates that it did not simply adopt the United States' argument that Mejia was telling the truth.   The question confirms that the jurors took seriously their obligations as "the sole judges of the credibility of the witnesses" to decide the case "based solely on the evidence."   J.A. 95–96, 98.   The prosecutor's comments did not prevent Pineda from receiving a fair trial.

### c.    Pineda cannot establish a plain error.

Pineda also cannot meet the requirements of the plain-error standard.   The "settled law of the Supreme Court or this Court" does not "establish that an error has occurred."   *Davis*, 855 F.3d at 595–96. Pineda is correct that the *prohibition against vouching* is well established.   *Br. of Appellant* 36.   But the conclusion that the prosecutor engaged in vouching is nowhere near "clear or obvious, rather than subject to reasonable dispute."   *Davis*, 855 F.3d at 595. To the contrary, this Court's precedent makes clear that her comments were not impermissible vouching.   *Campbell*, 347 F. App'x at 930; *Jones*, 471 F.3d at 544; *Ollivierre*, 378 F.3d at 423.

74

Even if Fourth Circuit precedent did not establish the propriety of the prosecutor's comments, it would not come close to settled precedent establishing a clear or obvious error. As discussed above, a host of decisions from this Court and others have repeatedly held similar arguments not to constitute vouching. And the dozen decisions cited in footnote 2 above are only examples among countless others. Under the plain-error standard, moreover, the prosecutor's comments cannot reasonably be susceptible to any interpretation other than improper vouching. *See Davis*, 855 F.3d at 595; *Vazquez-Larrauri*, 778 F.3d at 285. If counsel's comments can plausibly be construed as a fair argument — and they certainly can — then she was not "clearly or obviously vouching." *Id.*

The reaction of Pineda's multiple defense attorneys to the comments, moreover, confirms that the United States did not engage in any vouching, let alone plain or obvious vouching. *Vazquez-Larrauri*, 778 F.3d at 285. "The prohibition against vouching is widely understood by defense counsel." *Id.* at 285. Their "lack of any

75

objection suggests that neither tone nor context pointed toward vouching." *Id.* at 285.

Beyond failing to object at trial, defense counsel took the step of moving for a new trial with the benefit of two-weeks' reflection.   J.A. 436.   The motion specifically focused on the prosecutor's "rebuttal." J.A. 436.   Yet it said nothing about the prosecutor's discussion of the truth.   J.A. 435.   If the prosecutor's argument had contained any vouching, particularly if it were clear or obvious, Pineda's team of experienced defense attorneys would have mentioned it.

As mentioned, moreover, a "plainly improper statement is not enough to merit reversal on plain-error review," *Webb*, 965 F.3d at 268. Pineda cannot establish that the prosecutor's comments affected his substantial rights.   As explained above, he has not shown that the comments prejudiced him.

Perhaps most notably, Pineda's own closing argument — that Mejia "lied," "lied" again," would "lie fluently, conveniently, boldly," and was "good at conveniently lying," J.A. 398–400 — precludes him from establishing that the United States' argument that Mejia was instead

76

telling the truth "seriously affected the fairness of the trial." *Young*, 470 U.S. at 1049. Even if this Court were to conclude that the United States' comments "exceeded permissible bounds," those comments "respond[ed] substantially" to the defense argument "in order to 'right the scale.'" *Young*, 470 U.S. at 13–14. Supreme Court precedent establishes that they do not "warrant reversing a conviction," even if this Court concludes they were improper. *Id.* at 13 & n.10.

## CONCLUSION

The United States did not engage in prosecutorial misconduct. The United States, therefore, respectfully requests that this Court affirm the district court's judgment.

## REQUEST FOR DECISION ON THE BRIEFS WITHOUT ORAL ARGUMENT

The United States does not believe that oral argument will assist the Court in any material way and requests that this appeal be decided on the briefs.

Respectfully submitted, this 14th day of September, 2021.

> WILLIAM T. STETZER
> ACTING UNITED STATES ATTORNEY
> s/ Anthony J. Enright
> Anthony J. Enright
> NY Bar Number # 4485140
> Assistant United States Attorney
> 227 West Trade Street
> Carillon Building, Suite 1650
> Charlotte, North Carolina 28202
> Telephone: (704) 344-6222
> Fax: (704) 344-6229
> E-mail: Anthony.Enright@usdoj.gov

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief has been prepared using Microsoft Word 2010, Century Schoolbook, 14 point typeface.

2.     EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains _____12,989_____ words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.   If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

s/ Anthony J. Enright
Assistant United States Attorney
USAO Charlotte, NC

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have this day served a copy of the above upon Defendant herein by serving his attorney of record, Ann Hester, through electronic case filing.

This 14th day of September, 2021.

s/ Anthony J. Enright
Assistant United States Attorney
USAO Charlotte, NC